**UNITED STATES STEEL GROUP—A UNIT OF USX CORPORATION; AK Steel Corp.; Bethlehem Steel Corporation; Geneva Steel; Gulf States Steel, Inc. of Alabama; Inland Steel Industries, Inc.; LTV Steel Company, Inc.; Laclede Steel Company; National Steel Corporation; and WCI Steel, Inc., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**Pohang Iron & Steel Co., Ltd.; Preussag Stahl AG; Klöckner Stahl GmbH; Krupp Hoesch Stahl AG; Friedrich Krupp AG Hoesch–Krupp; Thyssen Stahl AG; Algoma Steel Inc.; Companhia Siderurgica Nacional; Usinas Siderurgicas de Minas Gerias, S.A.; Sidmar N.V.; Tradearbed, Inc.; Ipsco Inc.; Hoogovens Groep BV; N.V.W. (U.S.A.), Inc.; Dofasco, Inc.; Usinor Sacilor; Sollac; USS–Posco Industries; NKK Corp.; Kobe Steel, Ltd.; Nippon Steel Corp.; Nisshin Steel Co., Ltd.; Sumitomo Metal Industries, Ltd.; Kawasaki Steel Corp.; and Stelco, Inc., Defendants–Intervenors.**

**Slip Op. 94–201.**
**Court No. 93–09–00564–INJ.**

United States Court of
International Trade.

Dec. 30, 1994.

674

Dewey Ballantine, Alan Wm. Wolff, Michael H. Stein and Linda C. Menghetti, and Skadden, Arps, Slate, Meagher & Flom, Robert E. Lighthizer, John J. Mangan, Stephen Narkin, Barry Gilman and M.J. Mace, Washington, DC, for plaintiffs.

Lyn M. Schlitt, Gen. Counsel, U.S. Intern. Trade Com'n, James A. Toupin, Deputy Gen. Counsel, Kathryn A. Gilchrist, Scott D. Andersen and James M. Lyons, Washington, DC, for defendant.

Morrison & Foerster, Donald B. Cameron, Alan K. Palmer and Neal J. Reynolds, Washington, DC, for defendant-intervenor Pohang Iron & Steel Co., Ltd.

Arent Fox Kintner Plotkin & Kahn, Stephen L. Gibson, for defendants-intervenors Preussag Stahl AG, Klöckner Stahl GmbH, Krupp Hoesch Stahl AG, Friedrich Krupp AG Hoesch–Krupp and Thyssen Stahl AG.

Hogan & Hartson, Mark S. McConnell, for defendant-intervenor Algoma Steel Inc.

O'Melveny & Myers, Bruce R. Hirsh, Gary N. Horlick, for defendants-intervenors Sidmar N.V. and TradeARBED, Inc.

Paul, Weiss, Rifkind, Wharton & Garrison, George Kleinfeld, for defendant-intervenor IPSCO Inc.

Powell, Goldstein, Frazer & Murphy, Peter O. Suchman, Neil R. Ellis and Elizabeth C. Hafner, for defendants-intervenors Hoogovens Groep BV and N.V.W. (U.S.A.), Inc.

Rogers & Wells, William Silverman and Carrie A. Simon, for defendant-intervenor Dofasco, Inc.

Weil, Gotshal & Manges, A. Paul Victor and Martin S. Applebaum, for defendants-intervenors Usinor Sacilor and Sollac.

M. Jean Anderson and Bruce H. Turnbull, for defendant-intervenor USS–POSCO Industries.

Willkie Farr & Gallagher, William Barringer, Matthew R. Nicely, Nancy A. Fischer and James Durling, for defendants-intervenors NKK Corp., Kobe Steel, Ltd., Nippon Steel Corp., Nisshin Steel Co., Ltd., Sumitomo Metal Industries, Ltd., Kawasaki Steel Corp., Usinas Siderurgicas de Minas Gerias, S.A.

Christopher A. Dunn and Edmund W. Sim, for defendant-intervenor Stelco, Inc.

Dickstein, Shapiro & Morin, Arthur J. Lafave III and Douglas N. Jacobson, for defendant-intervenor Companhia Siderurgica Nacional.

## OPINION

RESTANI, Judge:

This matter is before the court on plaintiffs' motion for judgment on the agency

record, challenging the United States International Trade Commission's ("ITC" or "the Commission") negative material injury determination with respect to certain hot-rolled steel products from Belgium, Brazil, Canada, France, Germany, Japan, Korea and the Netherlands that were found to be subsidized or sold at less than fair value ("LTFV"). *Certain Flat–Rolled Carbon Steel Prods. from Argentina, Australia, Austria, Belgium, Brazil, Canada, Finland, France, Germany, Italy, Japan, Korea, Mexico, the Netherlands, New Zealand, Poland, Romania, Spain, Sweden, and the United Kingdom,* USITC Pub. 2664, Inv. Nos. 701–TA–319–332, 334, 336–342, 344, and 347–353, and Inv. Nos. 731–TA–573–579, 581–592, 594–597, 599–609, and 612–619 (Aug. 1993) (final determ.) ("*Final Det.*"); 58 Fed.Reg. 43,905, 43,906–07 (USITC 1993). In that determination, a majority of the ITC Commissioners[1] found that the United States industry was not materially injured or threatened with material injury by reason of LTFV sales of hot-rolled carbon steel.[2]

Plaintiffs U.S. Steel Group, AK Steel Corp., Bethlehem Steel Corp., Geneva Steel, Gulf States Steel Inc. of Alabama, Inland Steel Industries, Inc., LTV Steel Company, Inc., Laclede Steel Company, National Steel Corp., and WCI Steel, Inc. (collectively "Petitioners") are U.S. manufacturers of hot-rolled carbon steel products. Hot-rolled steel is employed in the construction, automotive, machinery and equipment industries. U.S. Int'l Trade Comm., Certain Flat–Rolled Carbon–Steel Products: Final Report to the Commission at I–34 (1993) ("Pub. Staff Rpt."). Most hot-rolled products are either used internally or transferred to an affiliated company for use in the manufacture of cold-rolled sheet and strip, or welded pipe. Pub. Staff Rpt. at I–34; *Final Det.* at 15. At oral argument, petitioners stated that a percentage of hot-rolled steel is also employed as substrate in the manufacture of corrosion-resistant steel. Approximately two-thirds of the domestic hot-rolled steel produced is "captively consumed" in the production of "downstream" products. *Final Det.* at 15 n. 37. The remainder represents hot-rolled steel sold to the open market. *See id.* at 15.

On August 18, 1993, ITC gave notice of its final negative antidumping duty determination. ITC found that: a/ LTFV imports from Belgium, Brazil, Canada, France, Germany, Japan, Korea and the Netherlands did not cause or threaten material injury to the U.S. industry, and b/ subsidized imports from Belgium, Brazil, France, Germany and Korea did not cause or threaten material injury. *Id.* at 9; 58 Fed.Reg. at 43,906–07.

Petitioners contest these negative determinations.

### A. *ITC's Determination*

The Commission found by a vote of 5–1 that imports from Brazil, Germany, France, Korea, and Japan did not cause or threaten material injury. All Commissioners voted in the negative regarding imports from Belgium, and by a vote of 4–2 the majority found imports from Canada and the Netherlands did not cause or threaten material injury. Dissenting views as to the threat finding were written by Commissioners Newquist and Rohr.

---

**1.** At the time of issuance of the Final Determination, the Commission consisted of Chairman Newquist, Vice Chairman Watson, and Commissioners Rohr, Brunsdale, Crawford and Nuzum. For ease of reference, and because the titles of some of the Commissioners have since changed, each of the members of the Commission will be referred to by the title "Commissioner" throughout the opinion.

**2.** All Commissioners joined portions of the majority determination. Commissioner Newquist joined only the discussions of like product, domestic industry and condition of the domestic industry. Commissioner Watson joined the discussion of all portions of the majority determina-tion. Commissioner Rohr joined all portions of the majority determination except for discussions on threat as to imports from Canada and the Netherlands. Commissioner Brunsdale joined only the discussions of like product, domestic industry, related parties, cumulation (except the discussion of negligible imports from the Netherlands), and threat. Commissioner Crawford joined all portions of the determination except for the negligibility analysis for Brazil and the competition analysis for France. Commissioner Nuzum joined the majority determination except for the negligibility analyses for Belgium, Brazil, Germany and Japan. *Final Det.* at 9 n. 4.

The Commission reasoned that a negative determination was appropriate for all countries subject to investigation because there was a lack of causal nexus between the subject imports and the condition of the industry. *Final Det.* at 52. The Commission found the domestic like product to consist of hot-rolled carbon steel flat products, including plate in coils and hot-rolled floor plate in coils. *Id.* at 14. During the period of investigation, the domestic industry's market share, by quantity, declined by one percent, and remained in excess of 93 percent. *Id.* at 52; Pub. Staff Rpt. at I–144 tbl. 103. The Commission also found market penetration of the subject imports to be low. *Final Det.* at 46–47. The Commission was unable to find convincing evidence that there was a relation between declines in domestic industry performance and minor increases in the volume of imports. *Id.* at 52–53.

The Commission noted that the large percentage of domestic industry production was captively consumed and concluded that the industry was affected only minimally by the subject imports. *Id.* at 21, 53. The Commission also determined that there was a lack of price effects by reason of the subject imports, partly because the product market was not highly price sensitive, nor were imports greatly substitutable with domestic products. *Id.* at 47–48. Although prices for domestic and imported products decreased somewhat during the period, import prices fluctuated and fell less than did domestic prices, imports generally oversold domestic products, and no lost sales or revenue allegations could be confirmed. *Id.* at 48–49.

In addition, the majority concluded that most Korean imports were shipped from defendant-intervenor Pohang Iron & Steel Company ("POSCO") to USS–POSCO Industries ("UPI"), an affiliated domestic producer. Thus, the remaining volume of imports sold on the merchant market was very small. *Id.* at 54–55. Some of these merchant market Korean products fell into niche product categories, thus substitutability was somewhat limited. *Id.* at 55. The majority found a lack of causal nexus between Korean imports as a whole and any material injury to the domestic industry. *Id.*

The Commission also determined that negligible imports from the non-cumulated subject countries were insignificant in absolute volume, and as a share of domestic consumption. *Id.* at 56. In part on the basis of data demonstrating significant overselling, the Commission found these imports had no significant effect on domestic prices. *Id.* at 56–57.

With regard to threat of material injury, the Commission exercised its discretion not to cumulate, making an individual negative finding for each subject country. *Id.* at 59. The majority determined that for Canada, an increase in market penetration over the period was offset by a significant increase in home market and third country shipments. *Id.* at 62. Although production capacity had increased, the majority noted that projections indicated a decline in 1993. *Id.* The majority stated that although there was the possibility of product shifting from corrosion-resistant products to hot-rolled products, the high cost of investment in a corrosion-resistant production line was a large incentive to continue to make as much higher value-added product as possible. *Id.* at 63. Thus, the majority concluded that the potential for product shifting was not significant, and that Canadian imports did not pose a threat. *Id.* at 63, 64.

Lastly, the Commission found that imports from the Netherlands did not threaten material injury. Despite increases in volume over the period, the absolute volume and market share of Dutch imports were found to be too low to indicate a likelihood that imports would rise to injurious levels. *Id.* at 70. Levels of capacity utilization were found to be high. *Id.* Although the Commission recognized the possibility of product shifting here also, it found the record lacked concrete evidence to warrant an affirmative finding for threat based on this factor. *Id.* at 71.

## Standard of Review

On a motion for judgment on the agency record, the scope of review of ITC's determination is whether it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988).

## Discussion

■ To determine whether material injury has occurred because of LTFV or subsidized imports under investigation, ITC is required to consider the volume of imports, their effect on domestic prices, the impact of imports on domestic production of the merchandise at issue, and other relevant economic factors. 19 U.S.C. § 1677(7)(B) (1988). Regarding impact of imports, relevant economic factors include, but are not limited to, the following:

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices,

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment, and

(IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the like product.

*Id.* § 1677(7)(C)(iii).

■ To find whether threat of material injury caused by LTFV imports exists, ITC must review ten factors, including foreign production capacity, market penetration, price suppression or depression, inventories of subject merchandise, underutilized foreign production capacity, potential for product shifting, and actual or potential negative effects on the industry's existing development and production efforts. *Id.* § 1677(7)(F)(i).

Petitioners argue that because of numerous errors in ITC's final negative material injury and threat determinations this matter should be remanded. Petitioners specifically contend that 1/ the Commission improperly included in its definition of the domestic industry the production of hot-rolled steel captively consumed in the production of downstream products; 2/ the Commission failed to cumulate Korean imports in its analysis of material injury; 3/ the Commission misapplied the negligibility exception and failed to cumulate imports from Belgium, Brazil, Germany, Japan, and South Africa; 4/ Commissioner Brunsdale misapplied the negligibility

exception, basing it solely on absolute magnitude of imports; 5/ the causation analyses of Commissioners Brunsdale and Crawford were improper and contrary to law; 6/ the causation analysis of Commissioner Watson was vague and contrary to law; 7/ the analyses of price sensitivity and substitutability by the Commission and Commissioners Watson, Brunsdale and Crawford, in particular, were inconsistent and unsupported by the record; 8/ the Commission's finding of no adverse price effects was based upon flawed methodology; 9/ the Commission's finding of lack of causal nexus, between marketplace developments after imposition of the preliminary bond and material injury, was incorrect; 10/ the Commission's negative threat determinations regarding imports from Germany, Korea and the Netherlands were incorrect as there was evidence of a risk of product shifting; and 11/ the Commission's negative threat determinations for Canada and the Netherlands were flawed because they were based on unreliable projections and were not supported by substantial evidence.

The court will discuss in turn each of petitioners' contentions, and the opposing views of defendant and defendant-intervenors.

### A. *Captive production*

The court and the parties agree that the captive production issue is one of major importance to the disposition of this matter, if not the most important issue. Because the petitioners continually adjust their argument, as various versions fail, this issue is somewhat difficult to discuss. The court will attempt to address all permutations of the argument.

■ Petitioners clearly assert that the Commission incorrectly addressed hot-rolled captive production in its assessment of the hot-rolled industry. Petitioners argue that the Commission's approach is contrary to the methodology applied in prior determinations for the steel industry, in which captive production was excluded. Petitioners also contend that inclusion of captive production is contrary to general agency practice. Because of this alleged error, according to petitioners, hot-rolled captive production has

been counted multiple times across the steel investigations, in cold-rolled, corrosion-resistant and plate production data, in addition to the hot-rolled industry analysis. Petitioners insist that the Commission should have applied a semi-finished product analysis to the hot-rolled captive production, thus treating such hot-rolled product as "work-in-progress" to be excluded from assessments of apparent consumption, market share, and financial performance in the hot-rolled industry investigation. *Final Det.* at 15.

Petitioners originally filed four individual steel cases for the hot-rolled, cold-rolled, corrosion-resistant, and plate industries. In the context of a like product definition, defendant indicates that petitioners could have, but did not, argue that captively produced hot-rolled steel was part of a downstream like product, was a separate like product,[3] or that all flat-rolled steel constituted one like product. Instead, petitioners' argument was made in the context of an objection to ITC's data collection methodology. Defendant contends that in past practice captive production has been included in U.S. industry data for other products, and its inclusion here is not a departure from such methodology.

Consistent with the petition filed, the Commission considered hot-rolled production to constitute one like product, regardless of end use.[4] The Commission rejected petitioners' proposal to exclude captive production from its analysis, despite petitioners' argument that inclusion would require the Commission to manipulate analysis of statutory factors for each industry to reflect a larger steel "industry," due to the "integrated nature of various producers of various products." *Id.* at 16–17. The Commission explained its change in methodology from prior steel in-

dustry determinations by noting that previously, it had not considered, and no party had raised, the issue of captive production in the steel industry. *Id.* at 18 n. 50; *see Citrosuco Paulista, S.A. v. United States,* 12 CIT 1196, 1209–10, 704 F.Supp. 1075, 1088 (1988) (upholding definition of like product and finding earlier determinations not binding for purposes of definition, in part because parties did not argue issue previously).

First, the statute defines like product as a product which is "like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation." 19 U.S.C. § 1677(10) (1988). The statute frames the definition of an industry in terms of like product, as the industry is "the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product." 19 U.S.C. § 1677(4)(A) (1988). The methodology applied here by the Commission, that is, analysis of the entire production of like product, previously has been used both in instances where the captively consumed goods were a component input of another entirely different product, or were a semi-finished or upstream version of another product. *See, e.g., Fresh Garlic from China,* USITC Pub. 2755, Inv. No. 731–TA–683, at I–5–I–6 (Mar. 1994) (prelim.) (finding one like product for all forms of fresh garlic, regardless of intended use, corresponding with scope investigation); *Tungsten Ore Concentrates from the People's Republic of China,* USITC Pub. 2447, Inv. No. 731–TA–497, at 5, 7–8 (Nov. 1991) (final) (determining one like product category contained three grades of product that were interchangeable, possessed similar production process and

---

3. The Commission examines five factors to determine whether a semi-finished product should be viewed as a separate like product different from the finished product, including: 1/ the necessity and costs of further processing for the semi-finished product, 2/ the degree of interchangeability between the semi-finished and finished products, 3/ the extent to which the use of the semi-finished product is dedicated to the finished product, 4/ whether the two products have independent markets and uses, and 5/ whether the semi-finished product imparts an essential characteristic or function to the finished product. *See, e.g., Stainless Steel Flanges from India and*

*Taiwan,* USITC Pub. 2600, Inv. Nos. 731–TA–639 and 640, at 5–6 (Feb. 1993) (prelim.).

4. The ITC considers the following factors in its determination of like product: 1/ physical appearance, 2/ interchangeability, 3/ channels of distribution, 4/ customer perception, 5/ common manufacturing facilities and production employees, and where appropriate, 6/ price. *Torrington Co. v. United States,* 14 CIT 648, 652, 747 F.Supp. 744, 749 (1990), *aff'd,* 938 F.2d 1278 (Fed.Cir.1991).

overlapped in channels of distribution); and *Polyethylene Terephthalate Film, Sheet, and Strip from Japan and the Republic of Korea,* USITC Pub. 2383, Inv. No. 731–TA–458 and 459, at 14, 19 (May 1991) (final) (determining one like product existed due to similarity in physical characteristics, product perceptions, channels of distribution, and lack of statutory basis to support exclusion of captive production).

Second, despite this statutory structure and agency practice, at oral argument petitioners contended that the way to count data for each like product group was to count the hot-rolled steel at the point at which it was to be consumed to manufacture a finished product. Tr. of Oral Argument at 82 (Sept. 28–29, 1994) ("Tr."). This approach, if applied evenhandedly, would most notably exclude from the foreign hot-rolled data the substantial amount of Korean hot-band imports manufactured by POSCO.[5]

If petitioners had wanted this data for both foreign and domestic hot-rolled steel destined for cold-rolled production, to be excluded from the hot-rolled investigation, they had ample opportunity to express this view in previous stages of the investigation. The court notes that neither did petitioners challenge the like product determination to seek exclusion of captive production on the basis

just articulated, nor did they ask Commerce to define a class so that the corresponding like product would exclude captive production.[6] Petitioners explain that prior to the determination, they had no reason to expect that domestic captive production would be treated differently from past steel determinations. Nonetheless, they do not now clearly ask for a different like product definition.

■ Third, petitioners now seem to request alternatively that the U.S. industry be defined separately from like product, and that the steel be counted only when it leaves the domestic producer's plant. The court cannot grant the petitioners' request. Once the like product has been determined, the definition of the industry follows. *See* § 1677(4)(A); *Asociacion Colombiana de Exportadores de Flores v. United States,* 12 CIT 634, 636, 693 F.Supp. 1165, 1167 (1988) (finding identification of like product necessary to determine which industry is examined for injury or threat of injury). Corporate boundaries are not contemplated as dividing lines within the definitions of either like product or the industry. *See* §§ 1677(4)(A), (10).

■ The court will assume *arguendo* that the petitioners have asserted and continue to

---

**5.** POSCO manufactures and exports hot-rolled, cold-rolled and corrosion-resistant steel. UPI, a joint venture between USX Corp. and POSCO, is a domestic producer of cold-rolled and corrosion-resistant steel. *Final Det.* at 37–38, 97. By contract, POSCO supplies all of UPI's hot-rolled needs. *Id.* at 38.

Petitioners stated in their prehearing brief that POSCO imports should *not* be considered as domestic hot-rolled captive production, as "POSCO's sale of hot band to UPI is essentially nothing more than a long-term supply contract with a fixed price." Def.–Ints.' Post Oral Argument Subm., Ex. 1 at 8 n. 11 (Pet'rs.' Prehearing Br., vol. 3). During the investigation, petitioners participated in the formulation of the questions for gathering data on captive production: "At petitioner's [sic] suggestion, we also revised the foreign producers' [sic] questionnaire to ensure that respondents report captive production and shipments." Def.'s App., vol. III, List 1, Doc. 499, at 2 (Mem. to the Commission from Lynn Featherstone, Feb. 4, 1993 (concerning changes in questionnaire from preliminary to final)).

**6.** Subsequent to oral argument, petitioners brought to the court's attention the Commission's determination in *Fresh Garlic from the*

*People's Republic of China,* USITC Pub. 2825, Inv. No. 731–TA–683 (Nov. 1994) (final) (*"Fresh Garlic II "*). Petitioners contend that the like product determination in *Fresh Garlic II* demonstrates what the Commission could and should have determined here, that is, a finding of several separate like products based upon differences in end use, lack of interchangeability of production facilities and production processes, and producers' and consumers' differing perceptions of each product group. The court does not agree that *Fresh Garlic II* dictates a different result. What petitioners previously argued for was the exclusion of captive transfers from the like product determination, although such product corresponded with that within the scope determined by Commerce. *Fresh Garlic II* rejected this approach, finding that the Commission did not have authority to exclude from a like product determination merchandise corresponding to that within the scope of a Commerce investigation. *Id.* at I–7. The type of like product differences found in *Fresh Garlic II* simply were not argued or demonstrated here.

assert a "like product" argument. Even so, the Commission did not err in following its general methodology of treating all of hot-rolled steel as one like product. *See, e.g., Smith–Corona Group v. United States,* 713 F.2d 1568, 1571 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984) (concluding agency has broad discretion in choice of methodology); *Torrington Co. v. United States,* 16 CIT 220, 230, 790 F.Supp. 1161, 1172 (1992), *aff'd,* 991 F.2d 809 (Fed.Cir.1993) (same). The court sees no clear way to draw a line between hot-rolled steel destined for in-house downstream steel products and hot-rolled steel that is destined, for example, for automobiles to be manufactured in-house. *See, e.g., Cambridge Lee Indus., Inc. v. United States,* 13 CIT 1052, 1054–55, 728 F.Supp. 748, 750 (1989) (holding lack of sufficiently clear dividing line existed to separate domestic brass into different like products); *Fresh Garlic from China,* USITC Pub. 2755, at I–5–I–6 ("We look for clear dividing lines between possible like products."); *Certain Compact Ductile Iron Waterworks Fittings and Accessories Thereof from the People's Republic of China,* USITC Pub. 2671, Inv. No. 731–TA–621, at 6 (Aug. 1993) (final) (same). As indicated, and as acknowledged at oral argument, petitioners want POSCO imports to be included for comparison to the domestic hot-rolled like product,[7] thus any reasonable request for a revised like product definition to segregate captive production would have operated to the disadvantage of petitioners' claimed objective.

Finally, the Commission's like product decision and its decision to include captive production did not lead to a skewed method of data collection. The Commission distinguished between data reported for merchant sales and for internal transfers, as to apparent consumption, shipments and income and loss experience. Pub.Staff Rpt. at I–39–I–40 tbls. 10–11; I–71–I–74 tbls. 26, 28–30; Def.'s App., vol. IV, List 2, Doc. 216 at I–105–I–106 tbl. 27 ("Conf.Staff Rpt."). Some firms reported data for employment, wages and productivity on an allocated basis, based on merchant market sales and on a portion of upstream processes, and others reported this data on a nonallocated basis. Pub.Staff Rpt., at I–58–I–60 & tbls. 18–19. The Commission, however, also articulated its methodology and indicated it had applied a consistent approach to estimating profitability of internal transfers captively produced, for all firms for which data was collected. *Id.* at I–64–I–65. Data on production capability, inventories, property, plant and equipment, capital expenditures, and research and development were reported on an aggregate basis because the Commission was unable to allocate the data between the merchant market and captive production. *Id.* at I–50–I–51 & tbl. 15, I–56–I–57 & tbl. 17, I–65.

Petitioners have not demonstrated to the court that the Commission abused its discretion, or ignored substantial evidence, in making its like product determination or in selecting a methodology for data collection consistent with the manner in which the petitions were filed.

## B. *Cumulation*

■ If certain statutory requirements are met, cumulation of imports from two or more countries "subject to investigation" is mandated for the determination of present material injury.[8] 19 U.S.C. § 1677(7)(C)(iv) (Supp. V 1993). The Commissioners have discretion not to cumulate if a country's imports are found to be negligible and to have no discernible impact upon the domestic industry. *Id.* § 1677(7)(C)(v).

---

7. Otherwise, petitioners could have sought from the International Trade Administration ("ITA") an end use definition of the "class or kind" of merchandise sold at LTFV. *See* 19 U.S.C. § 1673a(c)(2) (1988) (providing for investigation into whether class or kind of merchandise described in petition is being or is likely to be sold in U.S. at LTFV). Any such end use requirement, however, would also have necessarily excluded POSCO imports from the ITA case.

8. The statute provides, in part, that:

(I) In general

For purposes of [evaluating volume and price] ... the, Commission shall cumulatively assess the volume and effect of imports from two or more countries of like products subject to investigation if such imports compete with each other and with like products of the domestic industry in the United States market. 19 U.S.C. § 1677(7)(C)(iv)(I).

### 1. Imports from Korea

█ Petitioners find error in the Commission's negative present material injury determination because Korean imports were excluded from cumulative analysis. Petitioners urge that both the POSCO imports to supply UPI, and the Korean imports sold to the merchant market, should have been cumulated with other imports. Petitioners allege that there was evidence on the record that non-Korean imports competed significantly with Korean hot-rolled products, contrary to the finding of the majority. *See Final Det.* at 38–39.

The majority determined however that because the volume of these competing merchant market imports was so small, both absolutely and as a share of total Korean imports, such imports did not by themselves result in a reasonable overlap of competition.[9] *Id.* at 39. Regarding POSCO imports to supply UPI, the majority found that "these imports are in certain niche categories in which there were no other imports from subject countries during the period examined." *Id.* Because competition with other imports was lacking, the majority chose not to cumulate POSCO imports. *Id.*

The majority also noted that there existed "no unaffiliated domestic producer ... currently able to supply UPI with more than a small percentage of its requirements." *Id.* In that context, the majority found that,

> [the] discussion of imports from Korea destined for UPI does not turn on the fact that there exists a contract (however labeled) for the supply of UPI. The Commission is expressly not making a determination that any type of contractual supply relationship precludes a finding of competition.

*Id.* at 39 n. 218.

Petitioners first argue that the majority departed from the general rule for cumulation, because it assessed not only whether a reasonable overlap of competition existed between Korean and other subject imports, but also because it considered the contractual relationship between POSCO and UPI in deciding not to cumulate. This reading of the determination blurs the cumulation analysis the majority made clear.

█ To establish whether a reasonable overlap of competition exists, the Commission applies a four-factor test, assessing 1/ the degree of fungibility among imports and with the domestic like product, 2/ the presence of sales or offers to sell in the same geographic markets, 3/ the existence of common or similar channels of distribution, and 4/ whether the products at issue were simultaneously present in the market. *United Eng'g & Forging v. United States,* 15 CIT 561, 582, 779 F.Supp. 1375, 1393 (1991); *Fundicao Tupy S.A. v. United States,* 12 CIT 6, 10–11, 678 F.Supp. 898, 902, *aff'd,* 859 F.2d 915 (Fed.Cir.1988). These factors are not exhaustive, and no single factor is determinative. *Wieland Werke, AG v. United States,* 13 CIT 561, 563, 718 F.Supp. 50, 52 (1989).

In its determination, the majority initially found that POSCO hot bands imported by UPI were in niche categories and did not compete with other imports, on the basis of import data broken down by product category. *See Final Det.* at 39; Conf.Staff Rpt. I–235–I–236 tbl. 98, F–22–F–23 tbl. F–2. This data indicates that a significant majority of Korean imports fell into 2 product categories, for which no other country imports were received.[10] The majority thus relied upon product-specific characteristics in finding POSCO imports did not compete with other subject imports. The majority next stated that because of this finding, it was not required to reach the issue of competition with the domestic product. *Final Det.* at 39.

The majority went on to note, however, that no unaffiliated domestic producer was currently able to supply more than a small

---

9. Commissioner Newquist dissented from this finding, instead cumulating Korean imports on the basis that these imports were not negligible and that a reasonable overlap of competition existed between Korean imports and the domestic like product. *Final Det.* at 267–68.

10. The product categories, Products 27 and 28, are defined in terms of "PIW" (pounds/inches/width), gauge and tolerance. *See* Apps. to Def.–Ints.' Mem.Opp'n.Pls.' Mot.J. Agency R., App. 4, at 1 (Letter to Donna R. Koehnke from Donald B. Cameron (July 6, 1993) (concerning POSCO exports to UPI)).

amount of UPI's requirements, concluding that any theoretical domestic competition was too speculative to support a reasonable overlap finding. *Id.* at 39 & n. 217. The majority expressly stated its finding was not based upon the presumption that any contractual supply relationship precludes a finding of competition. *Id.* at 39 n. 218. Three of the Commissioners in the majority, Commissioners Rohr, Crawford and Nuzum, adopted this analysis without modification.

Two Commissioners, in their additional views, indicate that they relied not only upon product characteristics, but also upon the nature of the POSCO–UPI venture. Commissioner Watson reiterated the majority's findings, but added that on the basis of "the specific requirements of UPI and the relative lack of fungibility between the POSCO shipments to UPI and the other subject imports," there was no reasonable overlap of competition. *Id.* at 73. In addition, Commissioner Watson found no reasonable overlap of competition with domestic products, on the bases that no unaffiliated domestic producer could supply UPI with more than a small portion of its requirements, *id.*, and that "the relationship among UPI, USX and POSCO is unique." *Id.* at 74. Commissioner Watson noted that his determination regarding reasonable overlap of competition was based upon this unique relationship, but also stated the determination might have been otherwise had there been evidence of another domestic producer "ready, willing and able to supply UPI with hot band." *Id.* at 74 n. 9.

Commissioner Brunsdale also decided not to cumulate Korean imports, in part on the basis that imports to UPI were in certain niche categories where there were no competing imports. *Id.* at 311. Commissioner Brunsdale found that because "UPI is affiliated only with USX and POSCO and not with any other importer, . . . . [i]t is not economic to purchase this steel from other import sources . . . . [Thus,] there is no competition between POSCO and other importers." *Id.* While long-term contractual relationships cannot be used to shield unfairly traded imports, any error that may have existed in this regard is harmless, at least three Commis-

sioners in the majority were clear about avoiding this pitfall, and Commissioner Watson tempered his conclusion in a manner which indicates that he did not find the existing contractual relationship a bar to cumulation.

Petitioners next argue strenuously that the majority incorrectly found an absence of overlap between POSCO imports and domestic product on the basis of alleged lack of capability to produce the good. Petitioners note that the specifications UPI requires are not especially unique. Petitioners also assert that domestic manufacturers possess the capability to produce, although they may not do so currently, the quantity required. As to non-Korean imports, petitioners contend that the capability to produce is what the Commission should have considered, rather than actual production.

This argument is flawed for two reasons. First, UPI at no time argued, and the Commission did not find, that domestic producers are unable to meet UPI specifications. Rather, UPI argued, and the Commission found, that no domestic producer could satisfy all of UPI's production requirements: quantity, ability to supply long-term, and product specifications. Evidence on the record indicates that in the hot-rolled market, and for UPI specifically, the condition of the market is such that those companies that captively consume hot-rolled steel require large quantities over a long term to operate efficiently. *See, e.g.,* Def.–Ints.' Post Oral Argument Subm., Ex. 8, at 624, 663–64, 693 (test. of Leonard H. Chuderewicz); and *id.* Ex. 8, at 659–60 (test. of Robert Crandall).

Second, petitioners have mischaracterized the ability to produce as it relates to the reasonable overlap of competition requirement. Petitioners rely upon *Certain Forged Steel Crankshafts from the Federal Republic of Germany and the United Kingdom,* USITC Pub. 2014, Inv. Nos. 731–TA–351 and 353 (Sept. 1987) (final) [11] and *Thermostatically Controlled Appliance Plugs and Internal Probe Thermostats Therefor from Canada, Japan, Malaysia, and Taiwan,* USITC Pub. 2152, Inv. No. 701–TA–292 and Inv. Nos.

---

**11.** This determination was upheld in *United*

*Eng'g,* 15 CIT at 584, 779 F.Supp. at 1394–95.

731–TA–400, 402–404 (Jan. 1989) (final), in support. Yet these determinations stand for the proposition that actual production, and not mere theoretical ability to produce, establishes competition. In *Crankshafts,* the products at issue were forged steel crankshafts in a specific weight range, used in vehicle engines. USITC Pub. 2014 at 8. While the crankshafts were produced to particular specifications, the Commission found those of similar design to be fungible, as they were used interchangeably by purchasers. *Id.* at 15–16. The Commission noted the long-term contract nature of the market, *id.* at 21, and that bids from producers were requested and supplied. *Id.* at A–43–A–46.

Similarly, in *Probe Thermostats,* the imported and domestic products were produced to particular specifications, but were found to be interchangeable. USITC Pub. 2152 at 18–19. The manufacturers in *Probe Thermostats* also submitted bids, *id.* at A–35–A–37, thus they were ready, willing and able to meet requests for supply. Here, there is no evidence in the record that domestic steel manufacturers were ready to meet UPI's time and quantity requirements, nor had bids been submitted indicating such readiness. Thus, petitioners' position is not analogous to that of the producers in *Crankshafts* and *Probe Thermostats.*

Regarding overlap of competition between Korean and other imported products, petitioners contend that evidence exists concerning Japan's ability to produce high quality hot-rolled products that satisfy UPI requirements. Petitioners cite to the Japanese Respondents' Joint Prehearing Brief, wherein are described the same technologies that petitioners allege POSCO uses to make high quality hot-rolled products. *See* App. to Pls.' Mem.Supp.Mot.J.Agency R., Tab 5, at 49, 52 (Japanese Resp'ts.' Joint Prehearing Br.). Petitioners argue that there is evidence that POSCO and a U.S. producer possess the same hot-rolled equipment, purchased from a Japanese manufacturer. *See* Pls.' Post Oral Argument Subm., sec. IV (Korea), Tab 1, at

3–4 (Aff. of Gary E. Hoff). Petitioners assert that from this it is reasonable to infer that a Japanese respondent would possess such equipment as well, and thus be capable of producing competing imports. Mere capability of production (which is by no means clear) does not necessarily mean that a company will produce a particular niche product.

 Furthermore, defendant states that, contrary to petitioners' assertions, the Commission investigated equipment used by domestic producers, in supplemental questionnaires. Defendant concedes it did not inquire specifically into equipment owned by foreign producers, but petitioners did not propose that this question be incorporated in the questionnaire. Although an agency's failure to collect pertinent data may constitute an abuse of discretion, *Wieland Werke,* 13 CIT at 574, 718 F.Supp. at 60, in these circumstances petitioners have not established that the Commission failed to investigate Korean imports adequately.

Petitioners also maintain that the majority incorrectly found absence of overlap of competition between POSCO imports and other imports, in mistaken reliance upon importer questionnaire responses that allegedly covered less than 27% of total hot-rolled imports by volume in any year of the investigation. Petitioners conclude that the data does not support a finding that none of the subject imports met UPI specifications. Defendant and defendant-intervenors respond that coverage of the questionnaires was more than adequate, and that petitioners' characterization is grossly inaccurate.

Information in the Final Staff Report indicates that a large number of firms provided questionnaire data for these investigations overall. Specifically, of the questionnaires sent to the 351 firms who imported steel [12] and the 77 domestic producers,[13] responses came from 190 importers and 38 producers, accounting for over 70% of all importers of the subject product, and 96% of all 1992 open-market shipments by U.S. producers of

---

12. Of the 351 firms that received questionnaires, 88 firms indicated they did not import certain flat-rolled carbon steel products. Pub.Staff Rpt. at I–45.

13. Of the 77 firms believed to produce the subject products, 26 firms indicated that they did not produce certain flat-rolled carbon steel products. Pub.Staff Rpt. at I–41.

hot-rolled product. Pub.Staff Rpt. at I–38 n. 92, I–41–I–42 & n. 96, I–45 & nn. 100–01. Also, the Commission sought data from importers for selected hot-rolled products, to be used in its pricing analysis or in review of niche product arguments. *Id.* at 45 n. 102. This selection was the subject of debate among the parties and the Commission, with petitioners having some success in persuading the Commission of its views on the subject.

At oral argument, defendant-intervenors submitted charts to demonstrate that total 1992 import shipment data in importer questionnaire responses exceeded 75% of total shipments. Def.–Ints.' Post Oral Argument Subm., Ex. 5, at Exs. A–F. Defendant-intervenors indicated that petitioners' assertion was formulated on the basis of the wrong questionnaire responses, wherein importers had indicated shipments made *from inventory* only. Rather, defendant-intervenors argued, the coverage should be calculated from the data reported in response to the question requesting estimated 1992 total shipment volume by customer type. *See id.* Ex. 5, at Exs. D–F. Defendant-intervenors are correct.

The court notes that the Commission is not required to gather 100% coverage in the questionnaire responses before it can make a determination. The applicable standard is "not whether the Commission might have obtained additional information, but whether the determination is supported by substantial evidence on the record and according to law." *Hannibal Indus., Inc. v. United States,* 13 CIT 202, 208, 710 F.Supp. 332, 337 (1989). Thus, the court will only remand determinations where the Commission has failed " 'to seek necessary information.' " *Trent Tube Div. v. United States,* 14 CIT 780, 789, 752 F.Supp. 468, 476 (1990) (quoting *Hannibal,* 13 CIT at 207, 710 F.Supp. at 336) ("*Trent Tube I* "), *aff'd sub nom. Trent Tube Div. v. Avesta Sandvik Tube AB,* 975 F.2d 807 (Fed. Cir.1992). In *Trent Tube I,* the court rejected the argument that receipt of 23 out of 35 producers' questionnaires, some of which were incomplete, was insufficient to support

an affirmative injury finding. *Id.* at 788–89, 752 F.Supp. at 475–76.

Here, the questionnaire responses contained data for the two niche product categories for which UPI imported the highest volumes of POSCO products. *See* Apps. to Def.–Ints.' Mem.Opp'n to Pls.' Mot.J.Agency R., App. 3, at 30 (sample importers' questionnaire). On the basis of the summaries of this data, *see* Conf.Staff Rpt. at I–235–I–236 tbl. 98 F–22–F–23 tbl. F–1, the Commission found that POSCO products did not compete with other subject country imports.

Lastly, petitioners argue that the majority was inconsistent in its finding that the small volume of non-UPI Korean imports, less than 10% of total Korean hot band imports, did not satisfy the reasonable overlap of competition requirement. *See Final Det.* at 38–39. Petitioners point to the even smaller volumes of imports from South Africa and Belgium that the Commission found satisfied the competition requirement.[14] *See* Pub.Staff Rpt. at I–135 tbl. 94.

Korean imports shipped to the merchant market totalled significantly less than 100,-000 tons in 1991 and in 1992. While this volume exceeds those reported for South Africa and Belgium, petitioners' argument fails because the majority properly found the portion of competing non-UPI Korean imports to be a very small part of overall Korean imports. *Final Det.* at 39. The Commission also found the volume of merchant market Korean imports to be less than the volume of any other country's imports that were cumulated. *Id.* at 39 n. 215. In the case of South Africa and Belgium, although absolute import volumes were small, the majority of these imports competed,[15] representing a reasonable overlap of competition for the imports as a whole. *Id.* at 34, 42 & n. 234, 44. To conclude that Korean imports in general competed and thus should be cumulated, based upon the small percentage sold in the merchant market, would not be reasonable.

---

**14.** These imports were determined, however, to be negligible. *Final Det.* at 42, 44.

**15.** Although no specific information was obtained as to the grades of South Africa's hot-rolled imports, the majority assumed they were completely substitutable. *Final Det.* at 44.

For the foregoing reasons, the court finds ITC's determination not to cumulate Korean imports is supported by substantial evidence and is in accordance with law.

### 2. *The negligibility exception*

In its present material injury analysis, the Commission did not cumulate imports from Belgium, Brazil, Germany, Japan and South Africa, finding such imports were negligible and did not cause any discernible adverse impact.

Petitioners challenge the manner in which the Commission applies the negligibility provision of the cumulation statute. 19 U.S.C. § 1677(7)(C)(v).[16] The court finds no legal error in the interpretation or application of the negligibility provision by any of the Commissioners, even though the determinations are not uniform on the issue.

#### a. Commissioner Brunsdale's interpretation

■ From the petitioners' point of view, it is Commissioner Brunsdale who appears to engage in the most objectionable application of the statute. Commissioner Brunsdale focuses on the percentage of the market held by imports from a particular country. Except where additional factors indicate another result is appropriate, if a country's imports account for less than 1% (or sometimes less than 1.5%) of the U.S. market, generally Commissioner Brunsdale does not cumulate imports. *Cf. Torrington*, 16 CIT at 228, 790 F.Supp. at 1171 (finding imports from countries with less than 1% market share, absent extraordinary circumstances, and in market not very sensitive to price, were negligible).

Commissioner Brunsdale's approach is somewhat troublesome, because it leads to charges of a bright-line test, which is not permitted by the statute. *Id.* at 228, 790 F.Supp. at 1171. The results in these cases and Commissioner Brunsdale's adoption of the majority opinion in this matter, however, lead the court to conclude that she considered the full record in reaching her determination herein. On the other hand, her application of the statute appears to be at the most expansive boundary that may still be said to be within the discretion allowed the Commission on this issue. In another case, where imports were more pervasive, more diffuse by country source or more fungible,[17] such a mode of analysis might lead to a conflict with the basic purpose of the cumulation provision.[18] *See* H.R.Rep. No. 40, 1st Sess., pt. 1, at 131 (1987) (indicating negligibility exception is not to be applied in manner that subverts purpose of cumulation provision). All other Commissioners apply the negligibility statute in a less broad-brush manner, and have not erred as to the interpretation of law in this regard.

#### b. Burdens of proof

■ Petitioners raise another complaint regarding the law as to application of the negligibility provision. They allege that the Commission is not applying the proper burdens of proof to the resolution of the negligibility dispute. This argument is based in

---

**16.** The relevant statutory provision, in part, reads:

**(v) Treatment of negligible imports**
The Commission is not required to apply clause (iv) [cumulation] or subparagraph (F)(iv) [cumulation for threat] in any case in which the Commission determines that imports of the merchandise subject to investigation are negligible and have no discernable adverse impact on the domestic industry. For purposes of making such determination, the Commission shall evaluate all relevant economic factors regarding the imports, including, but not limited to, whether—
(I) the volume and market share of the imports are negligible,
(II) sales transactions involving the imports are isolated and sporadic, and

(III) the domestic market for the like product is price sensitive by reason of the nature of the product, so that a small quantity of imports can result in price suppression or depression.
19 U.S.C. § 1677(7)(C)(v).

**17.** Congress intended that,

[t]he ITC shall apply [the negligibility] exception with particular care in situations involving fungible products, where a small quantity of low-priced imports can have a very real effect on the market.
H.R.Rep. No. 40, 100th Cong., 1st Sess., pt. 1, at 130 (1987).

**18.** This is not to say that Commissioner Brunsdale would reach the same result where goods were fungible.

large part on the decision in *Creswell Trading Co. v. United States,* 15 F.3d 1054 (Fed. Cir.1994) (*"Creswell III"*), which discussed the burdens applicable to the resolution of an issue before the United States Department of Commerce in a countervailing duty investigation.

The original question before this court, in *Creswell Trading Co. v. United States,* 16 CIT 37, 37, 783 F.Supp. 1418, 1419 (1992) (*"Creswell I"*), was whether Commerce properly determined that a price reimbursement scheme was countervailable. Under the program, users of domestically-produced steel, pig iron, received a payment from the Indian government upon export of the finished product. *Id.* at 38, 783 F.Supp. at 1419. The payment equalled the difference between the higher-cost domestic product and the cost of the raw material on the international market. *Id.,* 783 F.Supp. at 1419. Plaintiffs argued that this program was not a countervailable subsidy, and relied upon Item (d) of the Illustrative List of Export Subsidies annexed to the Agreement on Interpretation and Application of Articles VI, XVI, and XXIII of the General Agreement on Tariffs and Trade, which defines a subsidy as follows:

> (d) The delivery by governments or their agencies of imported or domestic products or services for use in the production of exported goods, on terms or conditions more favourable than for delivery of like or directly competitive products or services for use in the production of goods for domestic consumption, *if (in the case of products) such terms or conditions are more favourable than those commercially available on world markets to their exporters.*

*Id.* at 39, 783 F.Supp. at 1420 (quoting H.R.Doc. No. 153, 96th Cong., 1st Sess. pt. 1 at 295 (1979) [19]).

Plaintiffs maintained that the program did not provide payments that exceeded the difference between the prices of goods in the domestic market and on the world market. *See id.* at 38, 783 F.Supp. at 1419–20. Commerce determined that this fact was irrele-

vant and that such a program was a subsidy under U.S. law, whether or not the rebate only offset the difference between domestic and world market prices. *Id.,* 783 F.Supp. at 1419–20. This court instructed Commerce to determine whether the program met the condition of the "if" clause set forth in Item (d). *Id.* at 40, 783 F.Supp. at 1421.

On remand, Commerce based its determination upon information that had been submitted during the original proceeding. *Creswell III,* 15 F.3d at 1059. While this information tended to demonstrate that the Indian program met the conditions of Item (d), it was not presented clearly, causing Commerce to make an error in its calculations. *Id.* at 1058–59. Commerce rejected any attempts by the respondent to correct the error, and simply concluded that the record evidence was "ambiguous" and that it did not support the claim. *Id.* at 1059. This court upheld the determination, emphasizing that the Indian government failed to carry its burden to establish a singular "world-market price" during the relevant period. *Creswell Trading Co. v. United States,* 16 CIT 776, 779, 797 F.Supp. 1038, 1040–41 (1992) (*"Creswell II"*).

In *Creswell III,* the Federal Circuit held that where the respondent produced evidence establishing a world price, Commerce could not reject the evidence without some other evidence showing that it was inaccurate. 15 F.3d at 1061–62. The court found that Commerce had the burden of proof to establish by a preponderance of the evidence the statutory condition established by the "if" clause of Item (d). *Id.* at 1060. It further held that Commerce had satisfied its burden of production by establishing the existence of the rebate program, but that the burden had shifted back to Commerce when respondents produced evidence that the services or products were not provided on terms or conditions more favorable than available on world markets. *Id.* at 1060–61. The court then concluded that Commerce had not met its burden of demonstrating that respondents'

---

**19.** This provision was incorporated into U.S. law through the Trade Agreements Act of 1979, § 2(a), (c)(5), 19 U.S.C. § 2503(a), (c)(5) (1988).

information was either inaccurate or insufficient. *Id.* at 1061–62.

Although the Federal Circuit did not rely upon any specific statutory or precedential authority, the court finds *Creswell III* may be understood more clearly if viewed in light of the requirements of the Administrative Procedure Act ("APA") and several other decisions in the Federal Circuit. In the first sentence of § 556(d) of the APA, the general rule applicable to burdens of proof is that: "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d) (1988). This provision has been construed to "allocate[ ] ... the burden of going forward rather than the burden of ultimate persuasion." *Environmental Defense Fund, Inc. v. EPA,* 548 F.2d 998, 1004 (D.C.Cir.1976), *cert. denied,* 431 U.S. 925, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977). The *EDF* court thus recognized what the fact of § 556(d) implies, that the burden of persuasion may rest on the challenger of a rule or order, where no statute or regulation has allocated the burden.[20] *See id.*

The *EDF* court found this analysis of burdens to be consistent with the "traditional approach that [the] burden [of going forward] normally falls on the party having knowledge of the facts involved." *Id.* An analogous principle applies in ITA cases to such matters as a respondent's claims to adjustments to its price data, and other matters clearly within a respondent's knowledge. *See, e.g., Zenith Elecs. Corp. v. United States,* 988 F.2d 1573, 1583 (Fed.Cir.1993) (finding that to demonstrate market is non-principal, for purposes of fair market value calculations, "[t]he burden of production should belong to the party in possession of the necessary information"); *Industrial Fasteners Group v. United States,* 710 F.2d 1576, 1582 n. 10 (Fed.Cir.1983) (holding in tax rebate adjustment dispute that "[b]ecause [respondent] possessed (or could gather) the necessary facts, the burden was its (not ITA's) to furnish that information").

The court finds that the *Creswell III* "burdens" analysis is inapplicable to the instant negligibility provision. Unlike Item (d), the cumulation statute does not articulate a particular factual requirement, which if not established, precludes applicability of the negligibility provision. The statute instead provides that in making a determination of whether imports are negligible and have no "discernable adverse impact," the Commission shall consider "all relevant economic factors regarding the imports," including, "but not limited to," volume, market share, nature of sales, and price sensitivity. 19 U.S.C. § 1677(7)(C)(v).

■ The language of *Creswell III* is difficult to apply broadly. Both Commerce and ITC are investigating agencies and triers of fact, and the facts found are to be judged by the reviewing court on a substantial evidence standard. 19 U.S.C. § 1516a(b)(1)(B); *see, e.g., Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1561 (Fed.Cir.1984) (finding where evidence insubstantial, reviewing court must either reverse ITC determination or remand for further fact-finding); *Chung Ling Co. v. United States,* 16 CIT 843, 846, 805 F.Supp. 56, 61 (1992) (acknowledging ITC's prerogative as factfinder and discretion to make reasonable judgments and inferences in interpretation of evidence, reviewable under substantial evidence standard); *Maine Potato Council v. United States,* 9 CIT 293, 300, 613 F.Supp. 1237, 1243–44 (1985) (same). Neither Commerce nor ITC is a party plaintiff or defendant. The only way the court perceives to apply *Creswell III* outside of its particular fact pattern is to assume that its specific language applies to a situation in which the statute or the regulation on its face creates a presumption, by giving dispositive weight to a particular fact, as opposed to a wide-ranging multi-faceted inquiry. *Creswell III* cannot be applied to establish a generally applicable burden of proof that the Commission must satisfy, without running afoul of the statute and numerous cases discussing the Commission's

---

**20.** In *EDF,* the governing statute incorporated the language of § 556(d), but the regulation applicable to the suspension-of-registration proceeding challenged placed the burden of persuasion upon the "proponent of the registration." *EDF,* 548 F.2d at 1004 (citing 40 C.F.R. § 164.121(g) (1975)).

fact-finding role and the judicial standard of review of such facts.

Having said that the appropriate mode of analysis of issues decided by the Commission is, in general, no different from the pre-*Creswell III* mode, for the sake of argument the court will attempt to address the issue of whether the Commission or respondents [21] failed to sustain either a burden of proof or production, as petitioners alleged, concerning the negligibility analyses. According to petitioners' theory, the Commission must cumulate imports from all countries subject to investigation unless the Commission establishes by a preponderance of the evidence that the imports from a particular country "are negligible and have no discernable adverse impact on the domestic industry." 19 U.S.C. § 1677(7)(C)(v). Petitioners argue that the Commission (or respondents) either failed to make a *prima facie* case, or that one of them failed to produce evidence to rebut petitioners' evidence of impact or to show that it was inaccurate. According to petitioners, *any* evidence of impact is enough to defeat a claim of no discernible impact.

First, the court rejects petitioners' claim that even one confirmed lost sale or instance of lost revenue is *per se* evidence of adverse impact. The determination of no adverse impact is a multi-faceted one, and the court will not construct a *per se* rule. Second, the Commission rejected evidence of certain lost sales or revenue for reasons of inaccuracy or failure to meet reasonable standards concerning such allegations. This is within its powers. *See infra* part F.1. Third, in its role as investigator, the Commission is allowed to select allegations to be investigated. *See Negev Phosphates, Ltd. v. United States,* 12 CIT 1074, 1092, 699 F.Supp. 938, 953 (1988) (holding ITC may, but is not required, to incorporate lost sales allegations in analysis of lost sales); *Copperweld Corp. v. United States,* 12 CIT 148, 169–70, 682 F.Supp. 552, 572 (1988) (holding no statutory provision requires ITC to use particular type of analysis to review lost sales).

As a trier of fact, the Commission is allowed to weigh the evidence of lost sales and revenue against other evidence relating to volume and price effects in making its impact determination. These three reasons, as well as demonstrating why the Commission did not fail to comply with any part of the *Creswell III* rule of analysis, are reasons why the broadest language in *Creswell III* cannot be applied directly here, or indeed, to most questions that come before this court in unfair trade cases.

The court will discuss separately whether each of the challenged negligibility determinations is supported by substantial evidence.

### c. Negligibility findings

Petitioners assert that the Commission incorrectly found that imports from Brazil, Belgium, Germany, Japan and South Africa were negligible. In all instances, petitioners argue that on the basis of absolute volumes, these imports accounted for substantial volume and thus must have had some injurious impact on the industry. Petitioners assert that when totalled, these absolute volumes represent nearly one quarter of the imports under investigation. Petitioners' contentions as to these individual countries stem from the view that "discernable adverse impact" may be measured by absolute volume and value, without including evaluation of market share and other price-related factors.

The court in *Torrington,* 16 CIT at 227–28, 790 F.Supp. at 1170, was presented with similar arguments. In affirming a determination that found imports from 12 of 14 subject countries to be negligible, the *Torrington* court held that absolute volume of imports does not have independent significance for negligibility purposes. *See id.* at 229, 790 F.Supp. at 1171. Rather, to assess whether imports are negligible and have no discernable adverse impact, the Commission is required by statute to weigh a number of

**21.** At oral argument in *Kern–Liebers USA, Inc. v. United States,* Consol.Ct. No. 93–09–00552–INJ (filed Sept 10, 1993), petitioners argued that respondents, rather than the Commission, bear the burden of proof on the issue of negligibility.

This does not change the analysis appreciably, as these cases do not involve trial-type proceedings involving plaintiffs and defendants before an adjudicator such as an administrative law judge.

factors in addition to volume, including trends in imports such as price declines, share of apparent domestic consumption, evidence of underselling, substitutability as well as whether imports were isolated and sporadic. 19 U.S.C. § 1677(7)(C)(v).

In its analysis of negligibility, the majority here reviewed these factors, and its conclusion to apply the negligibility exception was supported by substantial evidence. Three Commissioners found the market for hot-rolled products to be generally not price sensitive, and two Commissioners found the market to be moderately price sensitive. *Final Det.* at 32 nn. 161–62, 33 n. 163 and 315. The Commission noted that Belgian imports fell to statistically insignificant levels in 1992 after an increase to .2% in 1991. *Id.* at 41. The Commission determined that the sharp increase of Belgian imports in 1991 was aberrational and attributed it to response to short U.S. supply. *Id.* at 41 n. 231. In 16 of 19 instances, Belgian imports were found to have oversold the domestic product. *Id.* at 42 n. 235. Although these imports were not isolated and sporadic, the Commission determined that they were negligible, based on the level of overselling and the extremely low and decreasing market share. *Id.* at 41–42.

Similarly for Brazil, the Commission observed that during the period of investigation Brazilian imports held a very small share of the market, never exceeding .3%. *Id.* at 42. In 21 of 35 instances, these imports oversold domestic products. *Id.* at n. 242. Although there was evidence of greater substitutability for Brazilian products, most of which were commercial grade, the Commission concluded imports were negligible because of the extremely low volume and market share. *Id.* at 42–43.

German imports declined in volume by 35% over the period of investigation, and market share declined steadily, to .4% by 1992. *Id.* at 43; Pub.Staff Rpt. at I–135 tbl. 94, I–144 tbl. 103. In 62 of 66 pricing comparisons, German imports were priced higher than domestic product. *Final Det.* at 43 n. 248. Also, there were no confirmed lost sales or revenue allegations. *Id.* at 56. Again, the Commission found that the market share and volume data, as well as evidence of significant overselling, indicated German imports were negligible. *Id.* at 43.

The market share of Japanese imports declined over the period as well, to .3% in 1992. *Id.* The Commission also found a pattern of consistent overselling, with no instances of underselling. *Id.* at 43–44 & n. 253. The Commission determined that competition was attenuated because for the niche products Japan produced, either there was evidence of consistent overselling, or quality differences limited substitutability between certain Japanese specialty products and domestic products. *Id.* at 44. On the basis of low volume, market share and consistent overselling, the Commission found Japanese imports to be negligible.

Lastly, imports from South Africa only entered the U.S. market in 1992, accounting for a .1% market share. *Id.* The Commission determined that the low volume and market share for this limited time period warranted a finding of negligibility.

In each of these instances, the Commission clearly reviewed several factors in addition to absolute volume, to reach its negligibility determinations. In no instance have petitioners relied upon anything other than one factor, absolute volume, to challenge the Commission's reasoning. The court finds that for Belgium, Brazil, Germany, Japan and South Africa, the majority's determinations were supported by substantial evidence and in accordance with law.

### C. *Causation analysis*

 Respondents argue that Commissioners Brunsdale, Crawford and Watson utilize causation analyses that are inconsistent with the statute, its legislative history and judicial precedent. The court disagrees.

The statute provides that antidumping duties may not be imposed unless:

> the Commission determines that—
>
> (A) an industry in the United States—
>
> (i) is materially injured, or
>
> (ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded,

by reason of imports of that merchandise. 19 U.S.C. § 1673(2) (1988). Material injury is defined as "harm which is not inconsequential, immaterial, or unimportant." *Id.* § 1677(7)(A).

In an apparent attempt to avoid potentially conflicting explanations of this statutory standard, Commissioner Watson simply quotes from § 1673 to describe the causation analysis he employs. *Final Det.* at 45 n. 266. Commissioner Crawford, as well as the remainder of the majority, take care to repeat the admonitions of various court opinions and the legislative history that instruct the Commission not to weigh causes. S.Rep. No. 249, 96th Cong., 1st Sess. 57 (1979) U.S.Code Cong. & Admin.News 1979, p. 381; *Final Det.* at 45 & n. 267; *see generally id.* at 318. What then is the source of contention regarding the legal standard?

Respondents allege that Commissioner Watson has not spelled out his causation theory. While adhering to the statutory language, Commissioner Watson is very clear that he is searching for a sufficient causal link between imports and injury, a standard recognized in the legislative history. *Final Det.* at 45 n. 266 (quoting S.Rep. No. 249 at 75). Given Commissioner Watson's acceptance of the instruction not to weigh various causes of injury and his close adherence to statutory language and legislative history, the court cannot say that Commissioner Watson is applying anything other than the proper standard.

As to Commissioner Crawford, the problem appears to be that the Commissioner is not pleased with the "contributing cause" language used by some Commissioners and some court opinions. From this, petitioners infer that she is not complying with the court interpretation of the statute. If the Commissioner reads the "contributing cause" language to mean that where imports are a *de minimis* cause of injury, or a cause of *de minimis* injury, but are then combined with other causes of material injury so that an affirmative determination results, she is cor-

rect in rejecting the language. *See id.* at 45 n. 267.

In actuality, the contributing cause language relates to a mode of analysis wherein one assesses the state of the industry, which is affected by numerous factors, determines if such industry is materially injured, and then attempts to determine if imports contribute in a non-*de minimis* way to such material injury. *See, e.g., Encon Indus., Inc. v. United States,* 16 CIT 840, 841, 1992 WL 245899 (Ct.Int'l Trade 1992) (finding that imports which contribute even minimally to material injury is sufficient); *LMI–La Metalli Industriale, S.p.A. v. United States,* 13 CIT 305, 321, 712 F.Supp. 959, 971 (1989) (same), *aff'd in part and rev'd in part on other grounds,* 912 F.2d 455 (Fed.Cir.1990); *British Steel Corp. v. United States,* 8 CIT 86, 97, 593 F.Supp. 405, 413 (1984) (finding test for causation to be whether imports are contributing to injury suffered by domestic industry). As Commissioner Crawford does not employ this mode of analysis, she has no reason to address contributing causes. Commissioner Crawford, as do Commissioners Watson and Brunsdale, attempts to determine in one step if the domestic industry is materially injured by reason of LTFV or subsidized imports. Thus, the problem appears to be a semantic one created by shifting modes of analysis.

The language developed in earlier cases reviewing decisions based on a two-step method of analysis is not necessary if only a one-step analysis is involved. *See, e.g., Gifford–Hill Cement Co. v. United States,* 9 CIT 357, 368, 615 F.Supp. 577, 585–86 (1985) (stating in two-step analysis context: "[T]he Commission must rule in the affirmative if it finds *even slight contribution* from imports to material injury.") (emphasis added); *Maine Potato Council,* 9 CIT at 300–01, 613 F.Supp. at 1244 (stating affirmative determination is required if "LTFV imports were anything but a *de minimis* cause of injury"). While the two-step mode of analysis has some decision-making efficiencies, the statute does not dictate a two-step mode. *See generally R–M Indus., Inc. v. United States,* 848 F.Supp. 204, 206, 210–11 (Ct.Int'l Trade 1994) (affirming Commission determination

based on volume, price, impact, and related factors such as substitutability and underselling); *General Motors Corp. v. United States*, 827 F.Supp. 774, 778–79, 788 (Ct.Int'l Trade 1993) (affirming plurality determination that tracked statutory factors in deciding whether domestic industry materially injured); *Feldspar Corp. v. United States*, 825 F.Supp. 1095, 1099–1100 (Ct.Int'l Trade 1993) (affirming ITC determination analyzing volume, price, impact on imports). The statutory language fits very well with a one-step mode of analysis. Only if a two-step mode were employed, would one ask if such imports were a non-*de minimis* contributing cause of the state of the "materially injured industry." "Materially injured" in this sense, i.e., a variously caused state of being, should not be confused with the attempt to isolate imports as a cause of "material injury" in a one-step analysis.

Accordingly, the court finds no error in the standard of causation applied here.

### D. *Analysis of price sensitivity and substitutability*

Petitioners argue that the evidence in the record does not support the Commission's conclusions in its analysis of price effects. Petitioners contend that the price sensitivity findings conflict with prior hot-rolled steel determinations, and that analysis of the importance of price in customer decisions was inaccurate. With regard to substitutability, petitioners assert that the Commission ignored the "custom-made" nature of the market, and that the analyses of Commissioners Brunsdale, Crawford and Watson are flawed.

### 1. Prior determinations

 The Commission found that the price sensitivity of hot-rolled steel products was low or moderate, and that overall substitutability was limited. *Final Det.* at 32 & nn. 161–62, 33 n. 163, 47–48, 315. Petitioners state that these conclusions are at odds with prior steel industry determinations made in the 1980s, and that the Commission did not explain its departure from its past practice.

The court has recently considered the binding effect of prior price sensitivity and fungibility findings in a determination for the same product, and clearly found that the ITC is not prohibited from finding differently in subsequent cases. In *Connecticut Steel Corp. v. United States*, 852 F.Supp. 1061 (Ct.Int'l Trade 1994), the court held that,

> '[t]he Commission has discretion to ascertain which economic factors are relevant in an investigation[,] and the weight to be given those factors.' The court has long recognized that ' "each injury investigation is *sui generis*, involving a unique combination and interaction of many economic variables; and consequently, a particular circumstance in a prior investigation cannot be regarded by the Commission as dispositive of the determination in a later investigation." '

*Id.* at 1066 (quoting *Torrington*, 16 CIT at 226, 790 F.Supp. at 1170; *Citrosuco Paulista*, 12 CIT at 1209, 704 F.Supp. at 1087–88) (citation omitted).

The Commission here was presented with different facts and economic conditions than were presented in prior determinations. The Commission found that in contrast to the prior condition of the hot-rolled industry, the industry was characterized by significant and increasing product differentiation, as well as increasing lack of substitutability. *Final Det.* at 47–48, 53, 321–25, 340–41. As decided in *Connecticut Steel*, the court cannot hold that the Commission's prior determinations on the issues of price sensitivity and substitutability of hot-rolled steel bind the Commission here.

Further, although the court believes it was adequately explained, the court finds that the Commission was not obligated to explain in any particular manner the change in its views on price sensitivity and substitutability from prior determinations, as its analysis of these issues was clearly based on a different set of facts. *See Allied–Signal Aerospace Co. v. United States*, 28 F.3d 1188, 1191 (Fed.Cir.1994) (upholding ITA selection of "all others" rate under second tier of new BIA methodology without explanation for departure from past methodology, on basis that methodology was not analogous to regulation having force and effect of law), *petition for cert. filed,* 63 U.S.L.W. 3355, 33–55–56 (U.S.

Sept. 26, 1994) (No. 94–542). For these reasons, petitioners' argument on this point fails.

### 2. Purchasing decision data

■ Petitioners argue that the Commission's conclusion that non-price factors were more important than price in purchasing decisions was erroneous. Petitioners state that the Commission cited to the wrong table of data contained in the Staff Report, and it disregarded certain information. Defendant maintains that the citation error was purely clerical, and that the substantive analysis is clearly based upon data from the correct table. Defendant-intervenors further assert that both the chart miscited and the correct chart support the conclusion that a number of non-price factors are as or more important than price to the purchaser's decision.

In reaching its conclusion that purchasers found several non-price factors more important than price in deciding to buy foreign steel, the Commission commented that,

> 48 [purchasers] cited 'superior quality,' 7 cited 'more reliable supply' and 6 cited 'better technical support.'

*Final Det.* at 48. The Commission then referred in a footnote to page I–156 of the Staff Report, which reflects data regarding reasons purchasers bought from *domestic* sources. Pub.Staff Rpt. at I–156. Except for the number "48," the information the Commission recounted is contained in the text at page I–161 of the Staff Report, which gives reasons why purchasers bought from foreign suppliers when a comparable domestic product was available at a lower price. *Compare Final Det.* at 48 *with* Pub.Staff Rpt. at I–161. Only the number "48" appears to have been transposed from page I–156.

The Commission went on to note that of the purchasers providing reasons for buying domestic steel,

> 48 cited 'shorter lead times', 26 cited 'Buy American policies', 25 cited 'smaller minimum order sizes' and 24 cited 'more reliable supply'.

*Final Det.* at 48. In this instance, the Commission correctly cites to the data at page I–

156. The Commission did not, in its final determination, cite to further information in the Staff Report that "[a]n additional 44 purchasers reported that they did not and/or would not purchase ... from foreign sources if a comparable domestic product were available at a lower price." Pub.Staff Rpt. at I–161.

■ Petitioners argue that taken together, these two "errors" require remand, because the Commission's analysis was garbled and because the evidence supports a finding of price sensitivity. Reversal is not compelled when a mistake made by the administrative agency clearly has no bearing on "'the procedure used or the substance of [the] decision reached.'" *Kurzon v. United States Postal Serv.*, 539 F.2d 788, 796 (1st Cir.1976) (quoting *Braniff Airways, Inc. v. CAB*, 379 F.2d 453, 466 (D.C.Cir.1967)). The First Circuit, in *Kurzon*, reasoned that,

> [w]here a subsidiary finding is unfounded, the court will remand the case to the agency ... only if 'the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture.'

*Id.* (quoting *NLRB v. Reed & Prince Mfg. Co.*, 205 F.2d 131, 139 (1st Cir.), *cert. denied*, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953)). If the agency's determination is reasonably discernable, remand for error correction is inappropriate. *See Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed.Cir.1987); *see also Sandvik AB v. United States*, 13 CIT 738, 747–49, 721 F.Supp. 1322, 1331–32 (1989) (upholding ITC related party analysis despite citation to pricing data for different product in its seamless product discussion, noting ITC cited to correct information on seamless products in staff report), *aff'd*, 904 F.2d 46 (Fed.Cir. 1990).

■ It is clear that the Commission intended to cite to the table at page I–161 in its discussion of price sensitivity. The Commission reviewed evidence in both tables, and drew conclusions from both sets of data that are easily discernable, despite the citation error. Further, the purchaser questionnaire responses support the view that price is not

the most important factor in the purchasing decision. Rather, price is balanced against factors such as availability, supplier qualification, the existence of long-standing relationships with the supplier, and lead time. Price was rated critical or very important in approximately 13 percent of the 641 instances in which a purchaser rated a factor as critical or very important. *See* Pub.Staff Rpt. at I–158. Also, the Commission is not required to discuss all findings in the Staff Report to be able to reach its determination. ITC did consider the statement regarding the 44 purchasers, and relied on data from the same survey to reach its conclusion. In addition, other evidence on the record demonstrated that many purchasers bought domestic steel for numerous non-price reasons.

Accordingly, the clerical errors contained in the determination regarding purchase decision questionnaire responses do not compel remand on the issue of price sensitivity, as the Commission's finding is supported by substantial evidence.

### 3. Individual analyses

■ In reference to substitutability as it pertained to production and consumption for purposes of the like product analyses, Commissioner Brunsdale found the record to show, in general, that producers of one product could easily begin producing another product. *Final Det.* at 308. Commissioner Brunsdale also found that where producers were unable to make certain products easily, customers were able to substitute another product. *Id.* Later, in her discussion of material injury and specific price effects, Commissioner Brunsdale found substitutability between domestic and imported hot-rolled to be limited. *Id.* at 325. Petitioners assert that Commissioner Brunsdale was inconsistent in her analysis of substitutability.

As this court has noted previously, analyses of substitutability may vary somewhat under different provisions in the statute. *See R–M Indus.*, 848 F.Supp. at 210 n. 9.

Here, Commissioner Brunsdale's substitutability finding for like product purposes differed from her assessment with regard to material injury, based upon the requirements of the relevant statutory provisions. *See* 19 U.S.C. § 1677(7), (10); *see also Feldspar Corp. v. United States*, 825 F.Supp. 1095, 1100 (Ct.Int'l Trade 1993) (noting that for material injury substitutability is one factor in evaluation of volume and price). Thus, the court does not find Commissioner Brunsdale's conclusions about substitutability in differing contexts to be contradictory and hence unsupported by substantial evidence on the record.

■ Petitioners also challenge Commissioner Crawford's analysis of substitutability based on lack of price sensitivity, on the grounds that it is supported by flawed economic analysis. Commissioner Crawford stated in her determination on price sensitivity that the substantial availability of unused capacity in the domestic industry caused the domestic industry to react to changes in market conditions, including changes in volume of imports, by adjusting production level rather than price. *Final Det.* at 342. Although Commissioner Crawford did not cite to any authority for this proposition, at oral argument, defendant-intervenors offered a source that petitioners challenge. The court finds that Commissioner Crawford's economic analysis has some support in the literature on economic theory.[22] The court has previously approved of the Commission's use of economic models in the context of causation analyses, *see Maverick Tube Corp. v. United States*, 12 CIT 444, 448, 687 F.Supp. 1569, 1574 (1988), and finds no reason to discount Commissioner Crawford's application of one economic theory here. Injury determinations are extremely difficult to make and Commissioners should continue to search for both methods and tools that will bring more precision to the discipline.

Lastly, petitioners argue that Commissioner Watson's findings on price sensitivity are flawed, because he determined that hot-

---

**22.** *See* Edwin Mansfield, *Managerial Economics* 276–77 (1990) (finding marginal cost expected to rise when operating close to capacity, but in other situations marginal cost may be constant); George J. Stigler, *The Theory of Price* 142 & n. 13 (3d ed. 1966) (criticizing analysis of short-run marginal cost as approximately constant, but noting that empirical studies in support defended against charge of linear bias, without clear victory to either side).

rolled products were not price sensitive, and he concurred in Commissioner Crawford's views. *Final Det.* at 32 n. 162. As discussed, the court finds Commissioner Crawford's price sensitivity analysis and application of economic theory to be a viable approach, thus Commissioner Watson's concurrence is similarly upheld.

### E. *Price Effects*

Petitioners allege that the Commission's finding of no adverse price effects is flawed as it is based on a faulty methodology for analyzing lost sales data, and for collection of data on underselling.

### 1. Lost sales

■ Petitioners assert that with regard to a finding of no price effects, the determinations of Commissioners Watson, Rohr and Nuzum relied upon a lack of lost sales allegations. Petitioners argue that they submitted evidence of 130 lost sales allegations, of which they contend at least 17 were confirmed by customer letters. Defendant maintains that the Commission investigated all lost sales allegations for which the data was complete, and that the customer letters confirming instances of lost sales lacked credibility.

At oral argument, petitioners submitted evidence of the manner in which they provided information to the Commission to investigate lost sales allegations. *See* Pls.' Post Oral Argument Sub., sec. V (Material Injury Causation), Tab 2. Part of this evidence consisted of letters received from customers of a domestic steel producer, with attached excerpts from a chart of lost sales data. Pls.' Mem.Supp.Mot.J.Agency R. at Ex. 5. The chart was prepared by petitioners' counsel on the basis of data supplied by a domestic producer, initially in response to a section of the ITC's producer questionnaire. Tr. at 228–30. Customers were asked by the domestic producer to review the excerpt attached and to supply a brief letter of "confirmation." Tr. at 232–33.

At oral argument, defendant explained that these lost sales allegations were reviewed to determine which ones possessed complete information. Any allegations lacking information as to quantity, initial domestic price quotations, or country of origin, were not pursued further. Tr. at 287–88; Mem. to Commissioners Watson and Nuzum from International Economist, List 2, Doc. 224, pt. II, at I–41 n. 33 ("ITC Staff Mem."). The Commission selected for investigation just under one third of the lost sales allegations that met this description, which represented over 63%, by volume, of the 130 allegations. Tr. at 287–89; ITC Staff Mem., pt. II (chart of coverage on lost sales, lost revenues allegations). The Commission was unable to confirm with purchasers any of the 27 lost sales allegations selected. Tr. at 289; Conf.Staff Rpt. at I–294–I–295, tbl. 117.

When the 17 lost sales allegations confirmed by customer letter are reviewed under defendant's criteria for complete information, 16 of the 17 either lacked 1/ price quotes, 2/ an attachment with an excerpt from the chart, 3/ any reference in the confirming letter to the sales at issue, or the allegations were investigated further by ITC staff and found to be unsupported. Although at oral argument defendant conceded that in one instance it did appear that ITC staff improperly had rejected a lost sale allegation containing complete information, *see* Tr. at 295–96, this sale was for an extremely small amount, and its exclusion from further investigation constitutes harmless error.

■ The Commission has broad discretion to pursue an investigation in a manner that will yield substantial evidence to support its determinations. *See Granges Metallverken AB v. United States,* 13 CIT 471, 481, 716 F.Supp. 17, 25 (1989). There is no minimum standard set by Congress to measure the thoroughness of an investigation by the Commission. *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1561 (Fed.Cir.1984). Petitioners have not presented any reason why the Commission's selection of only those lost sales allegations with complete information is unreasonable. Thus, petitioners have not pointed to any procedure or method employed by the Commission in evaluating lost sales allegations that exceeded its discretion.

The court does not find the Commission's approach to its investigation into lost sales

allegations to be unreasonable, thus the Commissioners' determinations as to price effects and lost sales is supported by substantial evidence in the record.

### 2. Collection of underselling data

As to underselling data, petitioners argue that the Commission data should have reported delivered prices. Petitioners also argue that the weighted average unit price methodology used by the Commission results in a bias towards finding overselling. Petitioners contend that the Commission incorrectly abandoned its prior method of comparing largest sales of domestic and imported products, because the Commission has previously rejected the average unit methodology as inadequate.

■■ In the analysis of price effects, the Commission is required to determine whether significant price underselling by imports has occurred. 19 U.S.C. § 1677(7)(C)(ii)(I). The Commission has been given broad discretion in "analyzing and assessing the significance of the evidence on price undercutting." *Copperweld*, 12 CIT at 161, 682 F.Supp. at 565. It is within the agency's discretion to select a particular methodology, as long as the choice is supported by substantial evidence. *Mitsubishi Elec. Corp. v. United States*, 12 CIT 1025, 1050, 700 F.Supp. 538, 558 (1988), *aff'd*, 898 F.2d 1577 (Fed.Cir.1990).

■■ The Commission's questionnaire to U.S. producers, importers and purchasers requested that quarterly data for total quantity and total net f.o.b. value for sales or purchases from 1990 to 1992 be supplied. *Pub. Staff Rep.* at I–168. As in prior determinations, the Commission did not request that transportation costs be included, because the Commission has found these costs are not usually related to product value or pricing policies.[23] *See, e.g. Certain Stainless Steel Butt–Weld Pipe Fittings from Korea,* USITC Pub. 2601, Inv. No. 731–TA–563, at I–38 (Feb. 1993) (final); *Certain Welded Carbon Steel Pipes and Tubes from Taiwan,* USITC

Pub.1994, Inv. No. 731–TA–349, at A–38 (July 1987) (final). Defendant explains that in industries with significant transportation costs, exclusion of transportation costs avoids distortion of actual prices.

The court has previously upheld the Commission's practice of excluding transportation costs to determine pricing levels, rejecting the same argument made by petitioners here, that the Commission should have adjusted prices to account for costs associated with foreign import sales that allegedly offset lower prices. *British Steel,* 8 CIT at 95–96, 593 F.Supp. at 412–13. Similarly, in *Copperweld,* the court found the Commission was not required to factor the value of freight absorption and other service offered on imports as additional costs, to analyze the true level of price and underselling, as the Commission had obtained information in a manner designed to eliminate the differences in transportation costs. 12 CIT at 163, 682 F.Supp. at 567. Although *Copperweld* discusses the issue of cost adjustments for services on imports, the decision upholds the Commission's refusal to adjust price for cost factors. *Id.,* 682 F.Supp. at 567. As it did here, the Commission in *Copperweld* had in its questionnaires instructed that pricing data reported exclude transportation costs, *id.,* 682 F.Supp. at 567, thus *Copperweld* also supports the Commission's method for gathering the price data in its questionnaires.

Petitioners object to exclusion of transportation costs from price because domestic prices appear to be lower than import prices, and because they allege that many consumers of hot-rolled steel are located closer to a port than a domestic mill. Yet evidence in the record shows that almost all of the producers and importers that provided questionnaire responses reported selling their merchandise to customers within 500 miles of the point of inland shipment, because of high transportation costs. *See* Pub.Staff Rpt. at I–168; *Final Det.* at 51. Also, U.S. inland transportation costs for foreign and domestic sources do not appear to be significantly different. *See* Pub.Staff Rpt. at I–168.

---

**23.** The court notes that the Commission reviewed petitioners' earlier arguments concerning methodology, and the fact that petitioners did not request changes in the methodology as used in the questionnaires. *See Final Det.* at 51 n. 306.

Thus, petitioners' argument on this point is unavailing.

■ Regarding selection of methodology, defendant explained that because the large volume of pricing data on sales of similar sizes was unwieldy for application of a largest sales methodology, the Commission applied the weighted average unit pricing methodology. Pub.Staff Rpt. at I–171 & n. 221. The Commission has applied both methodologies in the past, separately and in combination, and has not abandoned the weighted average unit pricing approach. *See, e.g., DRAMs of One Megabit and Above from the Republic of Korea,* USITC Pub. 2629, Inv. No. 731–TA–556, at I–93–I–95 (May 1993) (final); *Magnesium from Canada,* USITC Pub. 2550, Inv. No. 701–TA–309, at I–75–I–78 (Aug. 1992) (final). Petitioners argue that the weighted average methodology is flawed because, unlike the "largest sales" methodology, it ignores evidence of whether large volume, low-priced sales of imports occurred. But defendant notes that in this industry, there are numerous same-sized transactions in any given period, any of which could be considered a largest sale. Thus, largest sales data reported could have been manipulated easily by producers and importers here, encouraging reporting of selected same-sized transactions that would benefit each group's interests. The defendant states the advantage of using a weighted average methodology here was better coverage of a number of transactions that were less subject to such manipulation.

Nonetheless, to address petitioners' concerns that discounts on large sales led to bias in pricing trends, the Commission recalculated all pricing data based solely on total quarterly sales in quantities less than or equal to 1000 tons. *Final Det.* at 50–51 & n. 305. The Commission found that this recalculation did not alter the trends in the pricing data, which indicated predominant overselling. *Id.* at 51. Thus, the Commission reasonably concluded that use of the weighted average unit pricing methodology was a viable mode of analysis.

Both the largest sales and weighted average methodologies have advantages and disadvantages. Petitioners have not demonstrated that the Commission's choice of methodology was an abuse of discretion. The court thus upholds the Commission's application here of a weighted average unit pricing methodology in analysis of pricing data.

3. Imposition of preliminary duties

■ Petitioners maintain that the Commission ignored evidence that imposition of preliminary duties by Commerce in December 1992 and February 1993 had improved domestic price and market share. The Commission found that the increase in domestic price did not prove that the subject imports had previously had an adverse effect on domestic prices. *Id.* at 52. The Commission noted that prior to imposition of duties, there was evidence that the subject imports did not suppress or depress prices significantly, and the Commission attributed price increases to general improvement in economic conditions in 1993. *Id.*

Petitioners contend that there is no evidence to support the finding as to improved 1993 conditions and that the record shows that prices declined in 1992, despite a 14% increase in apparent consumption by volume. *See* Pub.Staff Rpt. at I–144 tbl. 103. Further, petitioners point to the Staff Report to support their argument that a causal link exists between removal of duties and effects on the domestic industry, citing the Commission's comment that domestic producers' ability to make price increases "stick" depended in part upon the pending antidumping and countervailing duty investigations. *Id.* at I–153. Petitioners also assert that the Commission made no evaluation of market share in this context, and maintain that any domestic producers' gains in market share were secured at the expense of imports under duties.

The court has not in the past required that the Commission rely upon interim data, due to concerns as to reliability. *See General Motors,* 827 F.Supp. at 781 (noting that Commission, as trier of fact, has discretion to discount unreliable interim data). Thus the court does not find that the majority erred in declining to rely upon the 1993 interim data

for the period after imposition of preliminary duties.

### F. *Threat of Material Injury*

The statute directs the Commission to consider whether a U.S. industry is threatened with material injury by reason of the subject imports "on the basis of evidence that the threat of material injury is real and that actual injury is imminent." 19 U.S.C. § 1677(7)(F)(ii). Specifically, the Commission is to consider, among other relevant factors, a list of factors including: 1/ if a subsidy is involved, 2/ any increase in production capacity or existing unused capacity, 3/ any rapid increase in U.S. market penetration, 4/ the probability that imports will enter the U.S. at prices that will have a depressing or suppressing effect, 5/ any substantial increase in U.S. inventories, 6/ the presence of underutilized capacity, 7/ any other demonstrable adverse trends, 8/ the potential for product-shifting, and 9/ the actual and potential negative effects on the existing development and production efforts of the domestic industry. *Id.* § 1677(7)(F)(i).

#### 1. Product shifting

 Petitioners raise the argument that where the Commission has found an affirmative threat posed by certain cold-rolled and corrosion-resistant imports, it must necessarily find that hot-rolled imports from those same countries threaten material injury to the domestic industry, because foreign manufacturers allegedly are able to switch production easily. In support, petitioners offer evidence of the hot-rolled production process, and the existence of integrated producers, as sufficient to establish product shifting. Thus, petitioners contend that for imports from Germany, Korea and the Netherlands, the Commission was required to make an affirmative threat determination. Defendant responds that other than the theoretical ability to shift production, petitioners have offered no specific evidence to support the potential for such a shift.

The Commission determined that there was no probative evidence submitted to establish the likelihood of product shifting. *Final Det.* at 58. The Commission found that on the basis of the long-term relationships with customers, the production of specialized products, and the lack of interchangeability of particular production processes, product shifting was not likely, although it was theoretically possible. *Id.* The Commission noted that it would be highly unlikely for integrated steel producers to switch to intensive hot-rolled production if duties were imposed on cold-rolled and corrosion-resistant products, as there is significant incentive to produce in quantity as much of the higher "value-added" products as possible to recoup the cost investment in downstream production equipment. *Id.* at 58, 66. Petitioners have previously conceded this same point. *See* Def.–Ints.' Post Oral Argument Subm., Ex. 15, at 33–34 (Pet'rs.' Prehearing Br., vol. 3). Petitioners have also conceded that the only importer with a potential to shift to hot-rolled sales is a Korean producer, POSCO. Tr. at 331–32.

At oral argument, petitioners stated that certain evidence to support the actual possibility of product shifting was unavailable to them, including the amount of production to be imported into the U.S. in comparison to third country exports and home market production, and a comparison of the marginal variable cost of production for downstream and upstream products. Rather, petitioners assert, respondents would have possessed this information, and the Commission was in the best position to conduct an economic analysis of this type of information. Thus the petitioners argue that the Commission's investigation of this issue was inadequate. Petitioners offered no citation to support requiring the Commission to conduct a more detailed economic analysis of product shifting.

In assessing the risk of product shifting, the Commission has looked at capacity utilization, the likelihood that capacity will result in shipments to United States, and the channels of trade available for such increased capacity. *See National Pork Producers Council v. United States*, 11 CIT 398, 407–08, 661 F.Supp. 633, 640–41 (1987). Based upon an analysis of these factors, the record in this case does not support petitioners' product shifting hypothesis. At oral argument, de-

fendant noted that, for example, German hot-rolled production had reached 97% capacity utilization in 1991, before falling to 90.4% in 1992, and sales to the U.S. decreased over the period of investigation by nearly 50%. This evidence was before the Commission, and did not demonstrate much room for German capacity to expand or to increase exports into the U.S. market. Pub.Staff Rpt. at I–110 tbl. 69. The relevant data for Korea and Netherlands present similarly high percentages of capacity utilization. Conf.Staff Rpt. at I–196 tbl. 78, I–206 tbl. 83.

The Commission properly found that there was insufficient evidence to establish potential for product shifting, thus its negative threat determinations for Germany, Korea and the Netherlands are upheld.

### 2. Canada

■ Petitioners argue that the majority's negative threat finding was based upon weak evidence, particularly 1/ "self-serving" 1993 data from Canadian respondents regarding export and capacity projections, and 2/ information that explained the increase in volume of Canadian imports as attributable to the relocation of certain Canadian steel processors to the United States. Defendant and defendant-intervenors respond that the Commission weighed all evidence on the record, and that there was not substantial evidence to support a finding of threat.

The majority of the Commission concluded that imports of hot-rolled steel from Canada were not likely to suppress or depress prices of domestic steel, that the Canadian inventories did not support a threat finding, and that Canadian imports were not likely to increase to injurious levels. *Final Det.* at 62–63. To support this view, the majority relied upon data that Canadian imports generally oversold comparable U.S. product, that Canadian inventory volumes were small in the aggregate and as compared with total Canadian shipments, and that there was significant growth in Canadian home market shipments, along with a projected decline in exports to the United States in 1993. *Id.;* Conf.Staff

Rpt. at I–161 tbl. 60; Pub.Staff Rpt. at I–172 tbl. 110.

In contrast, petitioners argue that other evidence indicates that Canadian imports did pose a threat. Petitioners refer to the steady increase in volume of imports over the period of investigation,[24] a 20 percent increase of imports in the first quarter of 1993 as compared with the first quarter of 1992, the decline in price of Canadian imports over the period of investigation, and evidence that the domestic industry experienced a marked decrease in capital expenditures over the period. According to petitioners, these trends lead to the conclusion that the Canadian excess capacity would likely be directed at the U.S. market.

Regarding the issue of pricing, the court notes that Commissioners Newquist and Rohr, in their dissenting views, found that when the data was reviewed on an individual product basis, there was evidence of mixed underselling and overselling. *Final Det.* at 79, 264; *see also* Conf.Staff Rpt. at N–6 tbl. N–5, N–26 tbl. N–23, N–28 tbl. N–25, N–44 tbl. N–41. Commissioner Rohr stated that even where Canadian prices had exceeded U.S. prices, in 4 out of 6 instances Canadian prices were declining more rapidly. *Final Det.* at 79. Although the majority determined that instances of overselling of Canadian imports were significant overall, by unit value, *id.* at 62, the evidence indicates that trends in pricing varied by product group.

The evidence also shows that as a percentage of total shipments, over the period home market shipments were declining, and U.S. shipments nearly doubled. Conf.Staff Rpt. at I–161 tbl. 60. Canadian market penetration increased over the period, but the majority determined that this increase was not likely to rise to injurious levels, on the basis of respondents' declining 1993 projections for imports levels, production and capacity, and volume increases in home and third country shipments. *Final Det.* at 62. The majority also credits evidence that approximately 50 percent of the doubling in

---

24. The market share of Canadian imports increased from 1.2% to 1.9% over the period of investigation, and was in excess of the market

share for Korean imports. Pub.Staff Rpt. at I–144 tbl. 103.

Canadian import volume in 1992 is explained by the migration of numerous Canadian steel processors across the border that have retained their supply relationships.[25] *Id.* at 63. The implication being that such migration would not continue.[26] While the majority acknowledged that capacity utilization did not exceed 80%,[27] *see* Conf.Staff Rpt. at I-161 tbl. 60, it chose to rely upon evidence that one producer had indicated it would be eliminating a substantial amount of hot-rolled capacity, to find the decline in 1993 projected capacity was supported. *Conf.Final Det.* at 99 n. 388.

■■■ In reaching a threat determination, the Commission is afforded discretion in interpreting the data, and the court does not weigh the evidence. *Bando Chem. Indus., Ltd. v. United States,* 16 CIT 133, 136, 787 F.Supp. 224, 226 (1992), *aff'd,* 26 F.3d 139 (Fed.Cir.1994). While the court might weigh the evidence as did the Commissioners in the minority, the court notes that even one of those Commissioners found this a borderline case. The underselling data was at best mixed, no lost sales were confirmed, Canadian inventories were low, Canadian home market shipments were growing, and price effects were found to be on the low side. Even though Canadian imports reached the highest market share of any group of imports, it was still below 2%. As it was permissible for the majority not to cumulate for threat purposes, the market share may be viewed in relative isolation. In these circumstances, the courts finds the negative threat determination substantially supported.

3. Netherlands

■■■ Petitioners raise the same objection to the majority's negative threat determination for Dutch imports as for Canadian imports, alleging that the Commission relied mostly on respondents' "self-serving" 1993

projections for imports to the U.S. and ignored evidence of the rapid increase in Dutch import volume in reaching its conclusion.

Defendant and defendant-intervenors counter that despite increases in market share over the period of investigation, the absolute volume and market share of Dutch imports were considered by the Commission to be too low overall to support a finding of threat. The Commission noted that although trends demonstrated shipments to home and third markets decreased as U.S. shipments increased, very low levels of imports overall and high capacity utilization levels supported a negative finding. *Final Det.* at 70.

Commissioners Newquist and Rohr, in their dissenting views, found Dutch imports did pose a threat to the domestic industry. Commissioner Rohr noted that although Dutch imports did not currently have a price depressive effect, there were trends in capacity and export volume tending to show that the U.S. market was increasingly important to the Dutch industry. *Id.* at 80. The volume increase in Dutch imports over the period of investigation, however, is small. Pub. Staff Rpt. at I-135 tbl. 94.

In addition, instances of overselling of Dutch imports during the period of the investigation appear to be significant, exceeding underselling substantially in volume. *Id.* at I-172 tbl. 110; Conf.Staff Rpt. at N-26-N-28 tbls. N-23-N-25, N-43-N-44 tbls. N-39-N-40. Capacity utilization figures were high during the period of investigation, Conf.Staff Rpt. at I-206 tbl. 83, and the volume of imports was low, only amounting to no more than .6% of apparent domestic consumption. *Final Det.* at 70 & n. 447; Pub.Staff Rpt. at I-135 tbl. 94, I-144 tbl. 103. The court finds there was substantial evidence to support the finding that Dutch imports did not pose a

---

**25.** *See* Pls.' Post Oral Argument Subm., sec. VI (Threat), Tab 1, at 6-8 (Joint Prehearing Br. of Canadian Resp'ts Regarding Threat of Material Injury by Hot-Rolled Imports).

**26.** For purposes of future harm, once the processors are in the United States, they must be considered to be U.S. purchasers.

**27.** Evidence on the record indicates that for Canadian producers, the break-even rate of capacity utilization is approximately 80%. *See* App. to Pls.' Mem.Supp.Mot.J.Agency R., Tab 4, Pet'rs' Prehearing Br., vol. 7A (Threat) at 89 (citing Am.Metal Market, *Steel Outlook Gloomy in Canada,* at 3 (Jan. 15, 1992)).

threat of material injury, thus the Commission's finding must be sustained.

### Conclusion

The plaintiffs have failed to demonstrate error in the ITC's negative injury determination. Accordingly, the determination is sustained.