WHEATLAND TUBE COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant, and Dongbu Steel Co., Ltd., et al., Defendant–Intervenors.

Slip Op. 97–100.
Court No. 96–04–01078.

United States Court of International Trade.

July 18, 1997.

Schagrin Associates (Roger B. Schagrin), Washington, DC, for plaintiff.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis), Carlos A. Garcia, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Morrison & Foerster, LLP (Donald B. Cameron, Julie C. Mendoza, Craig A. Lewis and Panagiotis C. Bayz), Washington, DC, for defendant-intervenors.

### OPINION

RESTANI, Judge:

This matter is before the court on a motion for judgment on the agency record by plaintiff Wheatland Tube Company ("Wheatland"). Wheatland seeks a remand to the United States Department of Commerce

("Commerce") with instructions to (1) perform an anticircumvention analysis or provide legally sufficient reasons for failing to perform such an analysis, (2) determine that the scope of the standard pipe orders as evaluated under 19 C.F.R. § 353.29(i)(1) is not dispositively resolved with respect to the pipe at issue, and (3) conduct a scope inquiry pursuant to 19 C.F.R. § 353.29(i)(2). Defendant United States ("the government") argues that the case should be remanded because, as a matter of law, Commerce is not precluded from issuing an anticircumvention order in this proceeding and Commerce did not provide sufficient reasons for not performing an anticircumvention investigation. At this juncture, the government does not intend to deny the request for an investigation with further reasons stated. Commerce intends to conduct the inquiry. Defendant-intervenors Dongbu Steel Co., Ltd., *et al.* (collectively "the Korean Producers") oppose the government's request for a remand because they claim under the facts of this case an anticircumvention investigation for the alleged "minor alteration" is precluded by statute. The government and defendant-intervenors maintain that the scope determination under 19 C.F.R. § 353.29(i)(1) is supported by substantial evidence.

## BACKGROUND

On September 24, 1991, Wheatland and other domestic pipe producers filed antidumping duty petitions covering circular welded non-alloy steel pipe ("standard pipe") from Brazil, Korea, Mexico, Romania, Taiwan, and Venezuela. The scope of the antidumping investigations was similar in each petition. The petition covering products from Brazil, for example, listed the scope of the investigations as follows:

D. *Description of the Merchandise (19 C.F.R. § 353.12(b)(3))*

The merchandise that is the subject of this petition is welded non-alloy steel pipes, of circular cross-section, not more than 406.4mm (16 inches) in outside diameter, regardless of wall thickness, surface finish (black, galvanized or painted), or end finish (plain end, bevelled end, threaded, or threaded and coupled). These pipes and tubes are generally known as standard pipe, though they may also be called structural or mechanical tubing in certain applications. A more detailed description is provided below.

1. *Specifications, Characteristics and Uses*

Standard pipes and tubes are intended for the low pressure conveyance of water, steam, natural gas, air and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses. Standard pipe may carry liquids at elevated temperatures but may not be subject to the application of external heat. It may also be used for light load-bearing and mechanical applications, such as for fence tubing.

Standard pipes used in the United States are most commonly produced to the American Society for Testing and Materials (ASTM) standard A–53, although they may also be produced to the ASTM A–135 standard. Some imported standard pipe is also produced to the ASTM A–120 standard, a now defunct specification that was nearly identical to the A–53 standard. Products like fence tubing are often produced to proprietary specifications rather than to an industry standard. . . .

Standard pipe made to DIN and ASTM specifications may be sold with a plain or threaded end, with or without a coupling. It may also be sold with a "black" or "galvanized" surface. Black standard pipe is frequently coated with an oil or lacquer finish to inhibit corrosion, and it may also be painted. Galvanized standard pipe is coated with a protective layer of zinc to prevent corrosion.

*See* Antidumping Duty Petition for Circular Welded Non–Alloy Steel Pipe from Brazil; Def.'s Ex. 1, at 4–5. On October 21, 1991, Commerce initiated antidumping duty investigations covering standard pipe from the countries named in the petition. *See Circular Welded Non–Alloy Steel Pipe from Brazil, the Republic of Korea, Mexico, Romania, Taiwan, and Venezuela,* 56 Fed.Reg. 52,528 (Dep't Comm.1991) (initiation of antidumping duty investigations). The notice of the initi-

ation described the scope of the investigations as follows:

> The merchandise subject to these investigations is circular welded non-alloy steel pipes and tubes, of circular cross-section, not more than 406.4mm (16 inches) in outside diameter, regardless of wall thickness, surface finish (black, galvanized, or painted), or end finish (plain end, bevelled end, threaded or threaded and coupled). These pipes and tubes are generally known as standard pipe, though they may also be called structural or mechanical tubing in certain applications. Standard pipes and tubes are intended for the low pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses. Standard pipe may also be used for light load-bearing and mechanical applications, such as for fence tubing.

> Imports of these products are currently classifiable under the following Harmonized Tariff Schedule (HTS) subheadings: 7306.30.10 and 7306.30.50. Although the HTS subheadings are provided for convenience and customs purposes, our written description of the scope of these investigations is dispositive.

*Id.* at 52,529.

During the investigations, respondents requested clarification of the scope of the investigation regarding "triple-certified" standard pipe. Memorandum from Case Analyst to File (Nov. 15, 1991); Def.'s Ex. 3, at 2. By letter dated November 19, 1991, petitioners responded to Commerce's request for their position as to whether pipes that are produced to both ASTM A–53 standard pipe specification and to API 5L or other line pipe specifications should be included within the scope of investigations. The letter stated that, "[d]ual or triple certified standard pipe should be covered by these investigations only if they enter the United States under one of the tariff numbers listed in section I.D.3 of the petitions." Letter from Luberda to Commerce (Nov. 19, 1991); Def.'s Ex. 4, at 1.

By letter dated March 5, 1992, petitioners answered respondent's requests for clarification of the scope of the investigations with respect to certain structural tubing, mechanical tubing, and standard pipe products. The letter stated,

> *The scope,* as defined by the petition, the Department and the Commission, *clearly excludes* both *imports of line pipe* entering the United States in Harmonized Tariff System of the United States (HS) category 7306.10 and oil country tubular goods entering the United States in HS category 7306.20. The scope also clearly excludes boiler tubing entering in category 7306.30.5010 and cold-drawn or cold-rolled mechanical tubing that enters in category 7306.30.5015 or 7306.30.5020. Tube and pipe hollows for redrawing that enter the United States in HS category 7306.30.5035 are also specifically excluded.

> However, the scope covers all other pipe that (1) has the physical characteristics described in the petition and in the Department's and the Commission's scope notices, and (2) enters the United States in HS items 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.8525, or 7306.30.5090. Such pipe is within the scope of the investigation regardless of whether it may be referred to as standard pipe, mechanical tubing or structural tubing in various applications.

Letter from Schagrin to Commerce (Mar. 5, 1992) (emphasis added); Def.'s Ex. 5, at 2–3.

In April 1992, Commerce made its preliminary determinations in the investigations. *See, e.g., Circular Welded Non–Alloy Steel Pipe from Brazil,* 57 Fed.Reg. 17,883 (Dep't Comm.1992) (prelim.det.), and *Circular Welded Non–Alloy Steel Pipe from the Republic of Korea,* 57 Fed.Reg. 17,885 (Dep't Comm.1992) (prelim.det.). In September 1992, Commerce issued its final determinations. *See, e.g., Circular Welded Non–Alloy Steel Pipe from Brazil,* 57 Fed.Reg. 42,940 (Dep't Comm.1992) (final det. of LTFV sales), and *Circular Welded Non–Alloy Steel Pipe from the Republic of Korea,* 57 Fed. Reg. 42,942 (Dep't Comm.1992) (final det. of LTFV sales). The final determinations de-

scribed the scope of the investigations follows:

> The merchandise subject to this investigation is circular welded non-alloy steel pipes and tubes, of circular cross-section, not more than 406.4mm (16 inches) in outside diameter, regardless of wall thickness, surface finish (black, galvanized, or painted), or end finish (plain end, bevelled end, threaded, or threaded and coupled). These pipes and tubes are generally known as standard pipe, though they may also be called structural or mechanical tubing in certain applications. Standard pipes and tubes are intended for the low pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses. Standard pipe may also be used for light load-bearing and mechanical applications, such as for fence tubing, and for protection of electrical wiring, such as conduit shells.

> The scope is not limited to standard pipe and fence tubing, or those types of mechanical structural pipe that are used in standard pipe applications. All carbon steel pipes and tubes within the physical description outlined above are included within the scope of this investigation, *except line pipe*, oil country tubular goods, boiler tubing, cold-drawn or cold-rolled mechanical tubing, pipe and tube hollows for redraws, finished scaffolding, and finished rigid conduit. *Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in this investigation.*

> Imports of these products are currently classifiable under the following Harmonized Tariff Schedule (HTS) subheadings: 7306.30.10.00, 7306.30.50.25, 7306.30.50.32, 7306.30.50.40, 7306.30.50.55, 7306.30.50.85, and 7306.30.50.90. Although the HTS subheadings are provided for convenience and customs purposes, our written description of the scope of this proceeding is dispositive.

*See, e.g.,* 57 Fed.Reg. at 42,941 (emphasis added).

On October 26, 1992, the United States International Trade Commission ("ITC") notified Commerce of its determination that imports of circular welded non-alloy steel pipe, except mechanical tubing and finished conduit, from Brazil, Korea, Mexico, and Venezuela were materially injuring a United States industry. Consequently, Commerce published antidumping duty orders. *See Certain Circular Welded Non-alloy Steel Pipe from Brazil, the Republic of Korea (Korea), Mexico and Venezuela,* 57 Fed.Reg. 49,453 (Dep't Comm.1992) (notice of antidumping duty orders) [hereinafter "standard pipe orders"]. The notice described the scope of the orders in a manner similar to the description in the final determination of LTFV sales. *See id.*

On April 23, 1993, Wheatland and other domestic producers filed petitions with Commerce claiming that exports from Korea, Mexico, and Brazil of API 5L line pipe and dual certified pipe were circumventing the antidumping duty orders on standard pipe. Anticircumvention Petition; Pl.'s App., Tab 3. The alleged circumvention consisted of certifying API–5L A or B pipe, a more expensive product to produce, also as ASTM A–53–A and A–53–D standard pipe. See *id.* at 2–3 & n. 7. On June 7, 1993, Commerce informed interested parties that it had "determined that a scope inquiry pursuant to 19 C.F.R. § 353.29(i) is the appropriate action to respond to the issues raised by petitioners." Letter to Interested Parties from Lucksinger (Jul. 7, 1993); Pl.'s App., Tab 4, at 1.

In their comments on Commerce's scope inquiry, dated July 7, 1993, petitioners contended that "[t]he written scope description published in the antidumping duty order supports" the conclusion that line pipe and dual-certified pipe, "when intended for use as standard pipe or when actually used as standard pipe, is included within the scope of the antidumping duty order" covering standard pipe. Comments on Scope Inquiry; Pl.'s App., Tab 11, at 1. Petitioners claim that they did not concede that line pipe and dual certified pipe used as, or intended for use as, standard pipe was outside the scope of the antidumping duty order and assert that their decision to file an anticircumvention petition

rather than a scope clarification request was based on "the belief that an anticircumvention petition offered a more comprehensive approach to the same problem." *Id.* at 1 n. 1. Petitioners, however, did not then question Commerce's decision to conduct a scope rather than an anticircumvention inquiry.

In January 1994, Commerce published its preliminary scope determination. *See Certain Circular Welded Non–Alloy Steel Pipe from Brazil, the Republic of Korea, Mexico and Venezuela,* 59 Fed.Reg. 1929 (Dep't Comm.1994) (prelim. affirm. scope det.). In the background section of this determination, Commerce noted that the petitioners in the original LTFV investigations had filed anticircumvention petitions with Commerce contending that, pursuant to section 781(c) of the Tariff Act of 1930, as amended [19 U.S.C. § 1677j(c) ], and 19 C.F.R. § 353.29(g) (1992), exports from Korea, Mexico, and Brazil of API 5L line pipe and dual-certified pipe were circumventing the antidumping duty orders on standard pipe when they were actually used in standard pipe applications. *Id.* at 1930. Commerce stated that it had determined that a scope inquiry pursuant to 19 C.F.R. § 353.29(i) was the appropriate approach to address the issues raised by petitioners. *Id.* Following a *Diversified Prods.* analysis, Commerce concluded that the language of the scope descriptions in the orders "does not clearly include or exclude line pipe or dual-certified pipe falling within the scope of the orders which is actually used in standard pipe applications." *Id.* at 1931. Commerce preliminarily determined that:

> When API 5L pipe and dual-certified pipe are used in a standard pipe application and fall within the physical parameters outlined in the scope of the orders, they are the same class or kind of merchandise as standard pipe and are therefore included within the scope of the orders on circular welded non-alloy steel pipe from Mexico, Korea, Brazil, and Venezuela.

*Id.* at 1933 (citations omitted). Petitioners filed comments on Commerce's preliminary scope determination, but again did not challenge Commerce's decision to conduct a scope inquiry pursuant to 19 C.F.R. § 353.29(i) rather than an anticircumvention inquiry pursuant to 19 U.S.C. § 1677j(c) and 19 C.F.R. § 353.29(g). *See* Petitioners' Comments of Prelim. Affirm. Scope Det., Def.'s Ex. 13.

In March 1996, Commerce issued a final negative scope determination. See *Certain Circular Welded Non–Alloy Steel Pipe from Brazil, the Republic of Korea, Mexico and Venezuela,* 61 Fed.Reg. 11,608 (Dep't Comm. 1996) (final neg. scope det.) [hereinafter *"Final Scope Det."].* Commerce concluded that the scope language adopted in the standard pipe orders "excludes line pipe and dual-certified pipe." *Id.* at 11,609.

Subsequently, Wheatland filed this action contesting Commerce's final scope determination. Wheatland challenges Commerce's determination that line pipe and dual-certified pipe are not within the scope of the standard pipe orders as well as Commerce's failure to conduct an anticircumvention investigation pursuant to 19 U.S.C. § 1677j(c) and to provide a reasoned explanation for its decision not to conduct such an investigation. Thereafter, the government requested a remand with regard to counts three, four, and five of Wheatland's complaint so Commerce could reconsider Wheatland's anticircumvention petition and either file a reasoned explanation for the decision not initiate an anticircumvention investigation or initiate such an investigation. By an order dated October 9, 1996, the court denied the request, noting that Commerce had set forth its reason, that no objection was made to treating the request as one for a scope determination, and that it would be a waste of time and improper to order a remand until error has been demonstrated.

On April 8, 1997, the court ordered Commerce to "supplement its brief with an explanation of the meaning of 19 U.S.C. § 1677j(c)(1) & (2) as they relate to this case. Commerce shall also address any other legal issues which would preclude or allow an anticircumvention finding for the alleged 'minor alteration."' *Wheatland Tube Co. v. United States,* No. 96–04–01078 (Apr. 8, 1997) (order). The government responded with a supplemental memorandum stating that in Commerce's view,

a remand in this case would not be futile because, as a matter of law, the Department would not be precluded from issuing an anticircumvention order in this proceeding. In the Department's view, the statute would permit it to consider the allegedly altered merchandise to be within the scope of the outstanding antidumping duty order, notwithstanding the fact that the Department has determined that the merchandise is not within the class or kind of merchandise defined by the antidumping duty order. The subjecting of altered merchandise to coverage under the antidumping duty order is governed by the conditions explicitly set forth in the statute—that the alteration be "minor" and that Commerce not determine that inclusion of the altered merchandise within the scope of the order would be "unnecessary."

Def.'s Supplemental Mem. at 2.

## STANDARD OF REVIEW

This court "shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994); *Koyo Seiko Co., Ltd. v. United States*, 20 F.3d 1160, 1164 (Fed.Cir.1994).

## DISCUSSION

### I. Final Negative Scope Determination

Wheatland contends that Commerce erred in determining that the scope of the standard pipe orders, as evaluated under 19 C.F.R. § 353.29(i)(1), is dispositively resolved with respect to the pipe at issue. Wheatland maintains that Commerce should have conducted a scope inquiry pursuant to 19 C.F.R. § 353.29(i)(2) and evaluated line pipe and dual-certified pipe under the *Diversified Prods.* criteria of that regulation.[1] The government and the Korean Producers counter

that substantial evidence supports Commerce's final scope determination.

■■■ Commerce has the inherent authority to define the scope of an investigation. See *Koyo Seiko Co., Ltd. v. United States*, 17 CIT 1076, 1078, 834 F.Supp. 1401, 1403 (1993). This authority is codified in Commerce regulations. 19 C.F.R. § 353.29(i) (1996).[2] Under this regulation, the starting point for determining whether merchandise is within the "class or kind" of merchandise described in an antidumping order is to examine the descriptions of the merchandise in the petition, the initial investigation, and the determinations of the Secretary and the Commission to determine whether such descriptions are dispositive of the matter. *Id.* § 353.29(i)(1). If Commerce determines that the matter is not dispositively resolved, an analysis under the *Diversified Prods.* factors is conducted. *Id.* § 353.29(i)(2).

■ In the present case, Commerce first considered the language of the petitions and noted that the petitions (1) defined the subject merchandise as welded non-alloy pipes with certain physical criteria, (2) stated that the pipes and tubes in question were generally known as standard pipe, though they might also be called structural or mechanical tubing in certain applications, and (3) provided an illustrative list of typical uses for standard pipe and observed that the merchandise was most commonly produced to the ASTM A–53 specification for standard pipe. *Final Scope Det.*, 61 Fed.Reg. at 11,609. Commerce noted that the petitions did not mention either line pipe or dual-certified pipe. *Id.*

Furthermore, Commerce remarked that in the notice of initiation, it had adopted petitioners' language to define the merchandise covered by the investigations, which also did not mention either line pipe or dual-certified

1. The criteria set forth in *Diversified Prods. Corp. v. United States*, 6 CIT 155, 162, 572 F.Supp. 883, 889 (1983), and now found at 19 C.F.R. § 353.29(i)(2) are as follows: (1) the general physical characteristics of the merchandise, (2) the expectations of the ultimate purchasers, (3) the ultimate use of the merchandise, (4) the channels of trade in which the merchandise moves, and (5) cost.

2. In Commerce's most recent proposed regulations, such scope inquiries would be conducted under identical procedures set forth in section 351.225(k), and inquiries under 19 U.S.C. § 1677j(c) would be conducted under section 351.225(i). 61 Fed.Reg. 7308, 7374–76 (Dep't Comm.1996).

pipe. *Id.* Commerce also noted that neither the petitions nor the initiation notice indicated that actual end use was a consideration in designating the scope of the investigations. *Id.* at 11,610. Based on the petitions and the notice of initiation, Commerce concluded that physical characteristics, not actual end uses, defined scope and neither document addressed, and therefore neither definitely resolved, the treatment of line pipe or dual-certified pipe. *Id.*

Commerce next noted that the record reflects "some initial uncertainty at least as to whether multiple-stenciled pipe" was included in its investigations. *Id.* Commerce emphasized that in a letter dated November 19, 1991, petitioners acknowledged that importers could sell dual-certified pipe entered under the HTS line pipe item into either the line pipe or standard pipe market after it entered the United States. *Id.* at 11,610 & n. 4 (this knowledge was reiterated in the anticircumvention petitions). In their letter, however, petitioners stated that "[d]ual or triple certified standard pipe should be covered by these investigations only if they enter the United States under one of the tariff numbers listed in section I.D.3 of the petitions." *See* Letter from Luberda to Commerce (Nov. 19, 1991); Pl.'s App., Tab 13, at 1. Commerce also found the petitioners' intention to exclude any pipe entered as line pipe was further evidenced in a letter dated March 5, 1992, in which petitioners stated that "[t]he scope, as defined by the petition, the Department and the Commission, clearly excludes both imports of line pipe entering the United States in [HTS] category 7306.10 and oil country tubular goods...." *Final Scope Det.,* 61 Fed.Reg. at 11,610; *see* Letter from Schagrin to Commerce (Mar. 5, 1992); Pl.'s App., Tab 14, at 2. Based on these letters, Commerce concluded that "petitioners understood that HTS classification of pipe products was based upon the specificity of the category, not actual use, and that dual-certified pipe would be placed in the line pipe category and, thus, excluded from the order." *Final Scope Det.,* 661 Fed.Reg. at 11,610. Accordingly, Commerce stated that, "[i]n keeping with the petition and petitioners' November 19, 1991 letter, the scope language adopted by the Department does not make

actual end use a principal consideration in defining the products covered by the investigations." *Id.*

Commerce then noted that the scope language specifically excludes line pipe, without qualification. *Id.* Accordingly, Commerce found that line pipe is excluded from the scope of the order regardless of its actual use. *Id.* Commerce remarked that the scope language emphasizes the exclusion of pipe that "enters the U.S. as line pipe," language suggested by petitioners, and concluded that the physical characteristics and the classification of the merchandise as it passed through U.S. Customs (*i.e.,* "enters the U.S.") were the key factors in determining the scope of the order and not on the disposition of the merchandise at some later point in the stream of commerce. *Id.* at 11,611. Commerce found that this conclusion was supported by the use of the phrase "line pipe of a kind used for oil and gas pipelines" which was taken verbatim from HTS item 7306.10.10. *Id.* Commerce explained that Customs employs the phrase, "of a kind used for" to connote the chief or principal use of a product, not its actual use. *Id.* Accordingly, Commerce concluded that pipe which enters the U.S. as pipe "of a kind used for oil and gas pipelines" is excluded from the scope of the orders. *Id.*

Finally, Commerce pointed out that for purposes of its injury investigations the ITC, in defining the domestic like product (which corresponds to imported class or kind of merchandise), followed the language adopted by Commerce in the notice of initiation. *Id.* Commerce noted that the ITC distinguished line and dual-certified pipe from the subject merchandise in its final determination and did not include producers of line pipe in its definition of the U.S. industry for purposes of its affirmative injury determination. *Id.* (citing *Certain Circular Welded Non–Alloy Steel Pipes and Tubes from Brazil, the Republic of Korea, Mexico, Romania. Taiwan, and Venezuela,* USITC Pub. No. 2564, at I–7–I–13 (Oct. 24, 1992) (final det.) [hereinafter *"ITC Final Det."];* Def.'s Ex. 12, at 9–15. Commerce found that the ITC's "Producers' Questionnaire," however, requested data on the domestic production of pipes "that were

single or multiple stenciled to meet *standard pipe specifications,*" but the ITC did not indicate expressly whether or not dual-certified pipe was included in its injury analysis. *Final Scope Det.,* 61 Fed.Reg. at 11,611 (citing ITC Producers' Questionnaire at 14) (emphasis in original). Accordingly, Commerce concluded that "the record with respect to the ITC's treatment of dual-certified pipe is inconclusive, but cannot be read to conflict with the Department's scope language excluding dual-certified pipe." [3] *Id.*

Wheatland challenges Commerce's final scope determination as unsupported by substantial evidence. Wheatland claims that although the petitions and notice of initiation did not mention either line pipe or dual-certified pipe, this omission is not determinative because the focus of the investigation was on standard pipe and neither line pipe nor dual-certified pipe were being imported for standard pipe uses at that time. The court, however, finds this argument unpersuasive as petitioners were aware that line and dual-certified pipe are capable of being used for standard pipe applications, as noted by Commerce.

Wheatland also argues that its letter to Commerce dated November 19, 1991, does not constitute substantial evidence to support Commerce's finding that tariff classification, rather than end use, was dispositively established as a means for defining excluded merchandise. Wheatland asserts that the November 19, 1991 letter demonstrated that the petitioners clearly believed that dual-certified pipe could be classified as standard pipe and expected Commerce to resort to specialized records to identify subject goods. The court, however, disagrees with Wheatland's reading of its letter to Commerce. The letter clearly contemplates the use of tariff classifications as a means of defining the scope of the investigations. The fact that petitioners may have been mistaken in their presumption that dual-certified pipe would enter the United States under the classifications for subject standard pipe, which would be covered by the order, is not within Commerce's discre-

tion to correct by broadening the scope of orders, as Commerce rightly noted. *See id.* at 11,612.

■ Wheatland further argues that Commerce may not lawfully elevate tariff classification over the predominant method by which the merchandise description identifies the subject merchandise as this conflicts with the petitioners' intention to exclude line pipe entered for line pipe use, not line pipe for standard pipe uses, citing *Torrington Co. v. United States,* 14 CIT 507, 512–13, 745 F.Supp. 718, 722 (1990) ("It is the responsibility of ITA to interpret the term class or kind in such a way as to comply with the mandates of the antidumping laws, not the classification statutes."). The court finds *Torrington* inapposite, however, as Commerce made clear throughout the antidumping investigation and in its final scope determination that the key factors in determining the scope of these investigations were the physical characteristics and the tariff classifications of the merchandise. *See Final Scope Det.,* 61 Fed.Reg. at 11,611. While Commerce is not required to conform its scope determinations to classification categories as *Torrington* makes clear, use of tariff classifications to define scope is not prohibited and may serve Commerce's purposes, including administrative convenience. As Commerce stated, the exclusion of dual-certified pipe on the basis of tariff classification in the orders is not predicated upon the illustrative list of tariff classifications, but is instead "part of the written description of the scope and is, therefore controlling." *Id.* at 11,612 n. 7.

■ Finally, Wheatland argues that Commerce's final scope determination rests on a characterization of the ITC determination that is not supported by a reading of the determination or the record. Wheatland points out that at the ITC's injury hearing, in response to a specific question as to exclusion of all dual-certified pipe, petitioners' counsel stated that, "[i]t is not our intention to include it if it is used for an API line pipe

---

**3.** In fact, the ITC record is not inconclusive on this point. Dual certified pipe information was requested only from domestic producers which manufactured standard pipes. *See ITC Final*

*Det.* at 1–12 n. 20, 1–21 n. 48. There is no evidence that the ITC collected data from any domestic industry other than the standard pipe industry. *See* discussion, *infra* pp. 157–58.

application." Commerce Scope Recommendation Memorandum from Kuga to Spetrini (Oct. 25, 1993) at 4–5 (quoting ITC Hearing Trans. (prelim.), Inv. Nos. 701–TA–311, 731–TA–532–537, at 45–46 (Oct. 15, 1991)); Pl.'s App., Tab 5. Wheatland further contends that Commerce spliced together two ITC footnotes and falsely conveyed the impression that all dual-certified pipe was excluded from the investigation. Wheatland argues that the ITC's data collection respecting dual-certified pipe was entirely use-based and the ITC record and determination contained no substantial evidence to support Commerce's finding that tariff classification, and not end use, dispositively defined the subject merchandise.

Wheatland, however, ignores Commerce's finding that the ITC final determination clearly distinguishes both line and dual-certified pipe from the pipe subject to the investigations by discussing them in a section entitled "Other Pipe and Tube Products" and noting that line pipe is "produced to meet different specifications than 'standard' pipes, and a large percentage of line pipes are made to larger diameters than the pipes and tubes subject to these investigations." *Final Scope Det.*, 61 Fed.Reg. at 11,611 (quoting ITC Prelim. Det., USITC Pub. No. 2454 (Nov. 1991) at A–9). Commerce found that as the ITC "did not include producers of line pipe in its definition of the U.S. industry for purposes of its affirmative injury determination." *Id.* Commerce stated that the ITC "did not, therefore, examine the impact of imports of line pipe upon the domestic industry." *Id.* (citing ITC Final Det., USITC Pub. No. 2564 (Oct.1992) at I–7–I–13). Although the ITC collected aggregate domestic shipment data on pipe multiple stenciled to meet standard pipe specifications, it appears that the ITC did so only with respect to domestic producers that also identified that they produced subject standard pipe and there is no evidence that the ITC sought any additional producer shipment data from the remaining domestic producers of line pipe. *Id.* Under these circumstances, Commerce correctly determined that the ITC record does not support a scope finding which would include dual-certified pipe.

A fundamental requirement of both U.S. and international law is that an antidumping duty order must be supported by an ITC determination of material injury covering the merchandise in question. *See* 19 U.S.C. § 1673 (1994). The ITC, in defining like product for purposes of its injury investigations, followed the scope language adopted by Commerce. *See Final Scope Det.*, 61 Fed.Reg. at 11,611. The injury determination of the ITC, thus, covered only products within the original scope of the Commerce investigation. *See United States Steel Group v. United States*, 18 CIT 1190, 1197 n. 6, 873 F.Supp. 673, 683 n. 6 (1994) (ITC does not have authority to exclude from like product determination merchandise corresponding to that within scope of Commerce investigation). It would follow that any expansion of the scope by Commerce would extend the antidumping duty order beyond the limits of the ITC injury determination and would therefore violate both U.S. and international law.

Given Commerce's finding that the scope of the order is driven by physical characteristics and tariff classification of the merchandise, rather than actual end use, and excludes line pipe without qualification, the court finds that substantial evidence supports Commerce's final scope determination and the determination is in accordance with law.

## II. Minor Alterations Anticircumvention Inquiry

As indicated, Commerce seeks a remand to conduct an anticircumvention inquiry. Remand is improper unless Commerce has erred in the determination subject to review. *See Böhler–Uddeholm Corp. v. United States*, 946 F.Supp. 1003, 1008 (Ct. Int'l Trade 1996) ("Commerce cannot change a decision as a means to implement a new policy."). The importance of finality of determinations prevents amendment of an agency opinion for reasons of policy rather than error. *See id.* Commerce announced its decision to reject the minor alterations anticircumvention petition by letter dated June 7, 1993. Letter to Interested Parties from Lucksinger (June 7, 1993); Pl.'s App., Tab 4. The letter stated that Commerce "has

determined that a scope inquiry pursuant to 19 C.F.R. § 353.29(i) is the appropriate action to respond to the issues raised by petitioners." *Id.* at 1. Wheatland claims that this one sentence does not make clear to the parties the underlying basis of Commerce's decision not to initiate an anticircumvention investigation, and thus, cannot form the basis for upholding that decision.

While "[a]n administrative agency, generally, must cite the reasons for its decision in order that the reviewing court may ascertain whether the agency has acted arbitrarily," a court may uphold an agency's decision if the agency's path is reasonably discernible. *NTN Bearing Corp. of America v. United States,* 903 F.Supp. 62, 67 (Ct. Int'l Trade 1995) (citations omitted). The court finds that Commerce's determination that "a scope inquiry pursuant to 19 C.F.R. § 353.29(i) is the appropriate action to respond to the issues raised by the petitioners," was an adequate explanation of Commerce's decision under the facts of this case. *See* Letter to Interested Parties from Lucksinger (June 7, 1993); Pl.'s App., Tab 4, at 1. Implicit in that statement is the fact that when presented with petitioners' anticircumvention petition, Commerce necessarily observed that "alterations" of subject merchandise, as that term is normally understood, were not at issue. The government acknowledged this fact in its opposition to plaintiff's motion for a preliminary injunction, stating,

> section 1677j(c) is applicable only if the articles in question have been altered in form or appearance in some minor respects. Wheatland does not claim that the line pipe and dual-certified pipe have been altered in form or appearance in some minor respects. Consequently, it is ques-

tionable whether section 1677j(c)(1) is even applicable.

Def.'s Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj. at 20. It is undisputed that API 5L and dual-certified API 5L/ASTM A53 pipe are not created by altering the subject merchandise in form or appearance. Standard pipe, such as ASTM A53 pipe, is made to lower specifications than API line pipe and cannot be transformed into line pipe through a minor alteration. Line pipe is a distinct product, produced using different raw materials, manufacture to different chemical, dimensional, and weight specifications, and designed for different uses from standard pipe. See Letter from Morrison & Foerster to Commerce (July 19, 1993) at 29; Def.-Intvrs.' App., Tab 13, at 2. In an internal memorandum the Director of the Office of Policy stated that, "Commerce did not initiate an anti-circumvention inquiry, concluding that section 781 Act [sic] did not cover the type of situation described by petitioners." [4] Memorandum from Mueller to Esserman (Feb. 7, 1996), at 3; Pl.'s App., Tab 9, at 4. Moreover, petitioners appear to have acquiesced in Commerce's decision to conduct a scope investigation instead of a minor alterations provision by participating in the scope investigation and not objecting timely to Commerce's failure to conduct an anticircumvention investigation.[5] Consequently, Commerce determined that a scope inquiry, rather than a minor alterations investigation, was warranted. *See* Def.'s Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj. at 21 ("Wheatland well knew that Commerce had decided to conduct a scope inquiry *instead* of an anticircumvention inquiry.") (emphasis added).

Wheatland contends that Commerce erred in failing to conduct a minor alterations anticircumvention investigation after determin-

---

4. Even if under some circumstances distinct, not alterable products may be covered by the statute at issue, the facts of this case would still require exclusion from scope. *See* discussion, supra pp. 159–160.

5. While Wheatland states that it did not object because it expected Commerce to conduct an anticircumvention investigation if the final scope determination was adverse, Commerce gave no such indication when it began the scope investigation. Commerce's one line response made clear that a scope inquiry was not a first step, but

rather the only step to be taken. If Wheatland was misled by *Brass Sheet and Strip from Germany,* 56 Fed.Reg. 65,884 (Dep't Comm.1991) (final neg. circumvention det.), into believing an anticircumvention proceeding would follow an adverse scope determination, it should have been disabused of this belief by the answer it received here. Even after Wheatland received a favorable preliminary scope determination, it had the obligation to preserve its request for an anticircumvention inquiry if it might have desired one after the final scope determination.

ing that line and dual-stenciled pipe were outside the scope of the antidumping order. Wheatland argues that exclusion under one statutory ground, i.e., scope, does not preclude inclusion under another, i.e., anticircumvention. The minor alterations provision is the third of four parts which comprise the anticircumvention provisions which Congress added to the antidumping law in the Omnibus Trade and Competitiveness Act of 1988. *See* Section 781(c) of the Tariff Act of 1930 [codified as 19 U.S.C. § 1677j(c)]. The provision states:

(c) Minor alterations of merchandise

(1) In general

The class or kind of merchandise subject to ... (B) an antidumping duty order issued under section 1673e of this title ... shall include articles altered in form or appearance in minor respects ..., whether or not included in the same tariff classification.

(2) Exception

Paragraph (1) shall not apply with respect to altered merchandise if the administering authority determines that it would be unnecessary to consider the altered merchandise within the scope of the investigation, order, or finding.

19 U.S.C. § 1677j(c) (1994); *see also* 19 C.F.R. § 353.29(g) (1996) (same).

The government argues that the most reasonable interpretation of the plain language of the statute is that, where Commerce deems it necessary, it may "consider within the scope of the order" merchandise which has been "altered in minor respects" so as to fall outside the technical product description. The government claims that any other interpretation would render section 781(c) a nullity and would simply preserve the pre–1988 *status quo* with regard to merchandise altered in only minor respects. Thus, it argues the statute does not preclude an anticircumvention inquiry here.[6]

The government maintains that before 1988, Commerce could clarify, but could not alter the scope of antidumping duty orders. *See, e.g, Royal Business Machines, Inc. v. United States*, 1 CIT 80, 86–87, 507 F.Supp. 1007, 1013 (1980) (neither Commerce nor Customs can legally change results of LTFV and injury determinations); *Smith Corona Corp. v. United States*, 915 F.2d 683, 686 (Fed.Cir.1990) ("Although the scope of a final order may be clarified, it cannot be changed in a way contrary to its terms."). The government claims that Commerce's inability to change the scope of an antidumping duty order led to criticism that the antidumping laws were ineffective and permitted circumvention through slight modification of exports to remove products from the scope of existing antidumping duty orders. *See* H.R. Rep. 40, 100th Cong., 1st Sess., pt. 1, at 135 (1987) [hereinafter "House Report"]. Consequently, the government claims that Congress amended the antidumping laws in 1988, adding section 781 to prevent circumvention of antidumping duty orders.

The government claims that this legislation was highly controversial, with petitioners arguing that respondents were using technical product descriptions to evade antidumping duties and respondents arguing that petitioners would exploit unfairly any flexibility regarding the scope of antidumping duty orders by expanding their scope beyond the products covered by the injury determination. As a result of these opposing views, the government claims that Commerce has been "extremely cautious in applying the provisions" and has applied the minor alterations provisions in only two prior decisions. *See Electrical Conductor Aluminum Redraw Rod from Venezuela*, 56 Fed.Reg. 42,310 (Dep't Comm.1991) (final affirm. scope ruling) (Commerce concluded electrical conductor aluminum redraw wire was within scope of order on redraw rod where wire was produced by passing redraw rod through wire drawing mill); *Brass Sheet and Strip from*

---

6. The government, however, apparently only changed its mind from its initial view of the application of the statute here, after receiving Congressional inquiries. *See* Letter from Congressman Borski to Undersecretary of Commerce Eizenstat (Apr. 29, 1996), Def.-Intvrs.' App., Tab

24. This may bespeak a policy change, rather than simple error correction. The court need not, however, resolve what changed Commerce's mind. It need only determine whether error occurred.

*Germany,* 56 Fed.Reg. 65,884 (Dep't Comm. 1991) (final neg. circumvention det.) (Commerce determined that imports of 667 series brass were not circumventing order on 200 series brass as respondent was not altering 200 series brass, but producing different type of brass, the 667 series).

Although the government admits that the issue is not free from doubt, it concludes that the better interpretation of sections 781(c)(1) and (2) is that they would permit, in appropriate circumstances, the application of antidumping duties to merchandise not technically within the scope of the order, but which, from the standpoint of a practical business person, is in the same stream of exports for which the order was issued, *i.e.,* essentially the same merchandise going to essentially the same customer for essentially the same purpose. The government argues that such a carefully disciplined application of sections 781(c)(1) and (2) would not exceed the reach of the injury determination and would, therefore, remain a valid application of antidumping duties.

Furthermore, *the government asserts that the legislative history demonstrates that the House and the Senate held different views with regard to the effect of section 781(c),* with the Senate taking a more expansive view than the House. For example, the government points out that the Senate Report reads, "[n]ew sections are added to current law ... to allow the Department of Commerce to *expand* the scope of antidumping and countervailing duty orders to prevent circumvention and diversion." S.Rep. No. 71, 100th Cong., 1st Sess. 96 (1987) [hereinafter "Senate Report"] (emphasis added). In the government's view, the House appears to have taken a more restrictive view of the minor alterations provision so as to only include within the coverage of the antidumping order products that were modified in such minor ways that they would have been covered under the pre–1988 law. The House Conference Report states that:

> [T]he anticircumvention provisions are intended to address efforts to import the *same class or kind* of merchandise in slightly modified form and should typically fall within the ITC's prior finding of injury.

H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess. 602–03 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1635–36 [hereinafter "Conference Report"] (emphasis added). Furthermore, the House Report indicates that the purpose of the minor alterations anticircumvention provision is to determine "whether an alteration results in a change in the class or kind of merchandise, and is therefore no longer a minor alteration." House Report at 135.

The legislative history provides three examples of the types of minor alterations that the provision is intended to cover. First, steel sheet that has been tempered or rolled prior to importation would be considered to have been altered within the meaning of section 1677j(c) and within the scope or an antidumping duty order covering steel sheet. See House Report at 135. Second, an order covering cookware would be interpreted under the minor alterations provision to reach cookware with a fire resistant coating which is applied prior to importation. *See id.* Third, an order covering portable electric typewriters would reach typewriters with a calculator or memory feature. *See* Senate Report at 101. The Senate explained that:

> An important purpose of this provision is to avoid results such as the one reached by the Commerce Department in a case involving portable electric typewriters from Japan, where a minor alteration resulted in portable typewriters with calculator or memory features being excluded from the scope of an existing antidumping order on portable typewriters. The Committee intends this provision to prevent foreign producers from circumventing existing findings or orders through the sale of later developed products or of products with minor alterations that contain features or technologies not in use in the class or kind of merchandise imported into the United States at the time of the original investigation. Such later developments or minor alterations would not result in the exemption of the imported merchandise from the finding or order, unless the Commerce Department finds it unnecessary to include such products in the finding or order.

*Id.*

Given the ambiguity in the statute and the conflicting legislative history, the govern-

ment claims that Commerce's interpretation of the statute, allowing the minor alterations provision to be applied in the present case, is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Applying Commerce's interpretation of the statute to this case, the government argues that a serious question is raised as to whether standard pipe may have circumvented the order in a manner which the antidumping law's traditional scope provisions were not equipped to address and which the new anti-circumvention provisions were designed to cover. Accordingly, the government contends that Commerce must determine that whether the allegedly altered merchandise has been "altered in form and appearance in minor respects" by employing "practical measurements" to determine whether the merchandise has undergone a minor alteration. *See* Senate Report at 100. Commerce would consider such factors as, "the overall characteristics of the merchandise, the expectations of the ultimate users, the use of the merchandise, the channels of marketing, and the cost of any modification relative to the total value of the imported product." *Id.* In order to make this determination, the government requests a remand so that Commerce may review much of this information about standard pipe as well as line and dual-certified pipe which has already been obtained, and request any additional necessary information.

In the court's view, however, the intent of Congress is clear and the statutory language is unambiguous, applying only to merchandise that has been *"altered in form or appearance in minor respects"* from that which appears to have been originally within the scope of the antidumping order. The transformation contemplated by the statute is from a product that is arguably within the scope of an order to a product that is claimed to be outside the scope of the order because of a minor physical alteration. The minor alterations provision does not apply to a distinct product that is originally unambiguously

outside the scope of the order and is not produced by altering subject merchandise. Accordingly, Commerce's interpretation is not entitled to *Chevron* deference as Congress' intention is clearly expressed by the plain language of the statute. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

This meaning of the scope and application of section 781(c) is the only one which comports with the language and the legislative history of the statute. The court finds no basis to support the government's assertion of conflicting legislative views on the purpose of the minor alterations provision nor any support for the government's contention that one purpose of the legislation was to overturn established judicial precedent concerning the limits on Commerce's authority to interpret the scope of an order.[7] One would have expected Congress to be quite clear if it wished to take the law in a different direction in this area, from the direction traveled by the courts. *See, e.g.,* H.R.Rep. No. 1015, 98th Cong., 2d Sess. 68 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4960, 5027 (citing *United States v. Heraeus–Amersil, Inc.*, 69 C.C.P.A. 86, 671 F.2d 1356 (1982), as the court decision sought to be overturned by the legislation). Here, the Conference Report states that although under present law there is "[n]o specific [statutory] provision" governing minor alterations, "[u]nder current practice, Commerce includes within the scope of an antidumping or countervailing duty order or finding merchandise which has been altered in minor respects from the merchandise originally investigated." Conference Report at 600. Accordingly, the purpose of this amendment was to codify Commerce's current practice with regard to minor alterations, by clarifying that the scope of orders could cover such cases. *See* Senate Report at 99 (cited by government as supporting its view, which states that the bill "adds a new section 780(b) to the Tariff Act of 1930 to

---

7. Even if there were such a conflict in the original legislative reports the Conference Report, which is clear, would control.

*clarify* the scope of an antidumping or countervailing duty order.") (emphasis added). Accordingly, there was no intent to overturn court precedent or general Commerce practice.[8]

■ Finally, in the present case, Commerce determined that line and dual-certified pipe were clearly excluded from the scope of the antidumping duty order. Under section 1677j(c)(2),

> Paragraph (1) shall not apply with respect to altered merchandise if the administering authority determines that it would be unnecessary to consider the altered merchandise within the scope of the investigation, order, or finding.

19 U.S.C. § 1677j(c)(2). As Commerce has made a final determination that the alleged "altered merchandise," namely line and dual-certified pipe, is clearly excluded from the scope of the antidumping duty orders in effect on standard pipe, section 781(c)(1) "shall not apply," as it is unnecessary for Commerce to include the "altered" merchandise to protect the antidumping duty order. The contrary interpretation sought by plaintiffs and defendant (at least in this case) would allow expansion of the order well beyond its original scope and that of the ITC injury determination and could cause a conflict with GATT requirements of an injury determination. There is no indication Congress wished to create such a conflict. In fact, the statutory scheme indicates just the opposite. Of the four anticircumvention provisions, the minor

alterations provision is the only provision which does not require Commerce to notify the ITC before making a scope determination. *See* Conference Report at 601–04 (ITC advice). The legislative history provides with respect to the other three provisions that,

> The purpose of this provision authorizing ITC injury advice is to ensure that any anti-circumvention action taken is consistent with U.S. international obligations....

> It is the expectation of the conferees that findings by the ITC that the inclusion of the merchandise is inconsistent with the prior injury determination would be relatively unusual, since the anti-circumvention provisions are intended to address efforts to import the same class or kind of merchandise in slightly modified form and should typically fall within the ITC's prior finding of injury.

*Id.* at 602–03. Congress obviously contemplated that the minor "alterations" would be so minor that conflict with ITC injury determinations would not be an issue. The words of the statute are sufficiently clear. They indicate that Congress wished to permit and even favor certain kinds of scope clarifications. Congress did not approve, through the minor alterations provision, wholesale changes to the scope of orders. As each stage of unfair trade proceeding builds on the last, such changes are intolerable.[9] *Roy-*

8. Although the Senate Report also indicated that an important purpose of the minor alterations provision is to "avoid results such as the one reached by the Commerce Department in a case involving portable electric typewriters from Japan," it is not clear from Commerce's determination or the Senate Report whether that case actually involved a minor alteration or, rather, a later developed product, for which another statutory provision exists. *See* Senate Report at 101; *see also* 19 U.S.C. § 1677j(d) (covering later-developed merchandise). In any case, even if the relevant provision was addressed, Congress did not disavow Commerce's general practice, rather it rejected what may have been an aberrant result.

9. Petitioners usually desire to define the subject class of imported merchandise in such a way as to obtain an order which is of maximum breadth. Petitioners, however would not want to define the class of merchandise so broadly that the

corresponding domestic industry would include a substantial number of uninjured components. This might result in a negative ITC injury determination. While the parties do not argue that this would have been the case here if the original product description was as petitioner now wish it to be, this is a serious consideration for purposes of interpretation of the statute. When a class of merchandise already exists and is well known to the parties, the minor alterations provision should not allow a petitioner to broaden the scope of an order in a way which petitioner avoided at the outset. *see, e.g., Encon Indus., Inc. v. United States,* 16 CIT 840, 842 (1992) (importer attempt to avoid effects of unchallenged like product determination rejected); *United States Steel Group,* 18 CIT at 1197, 873 F.Supp. at 683 (petitioners desirous of including certain Korean imports within scope of order defined domestic like product in a way which resulted in negative determination).

*al Bus. Machines,* 1 CIT at 87, 507 F.Supp. at 1014 ("Each stage of the statutory proceeding maintains the scope passed on from the previous stage.").

As the statute is unambiguous and applies only to merchandise arguably within the scope of the antidumping duty order which is altered to be outside the order, the minor alterations provision does not apply to the present case. Here, the merchandise at issue was always known to the parties, was discussed in respect to several rulings on scope and clearly was not included within the scope of the order. Accordingly, Commerce did not err in declining to perform an anticircumvention investigation. As no explanation by Commerce could alter the result under the statute, remand is unnecessary. Plaintiff's and government's request for a remand is denied and the final scope determination of the Department of Commerce is affirmed.

